Sol Wachtler, J.
On August 31, 1965 the plaintiffs, who are welfare recipients, agreed to purchase a home freezer unit for $900 as the result of a visit from a salesman representing Tour Shop At Home Service, Inc. With the addition of the time credit charges, credit life insurance, credit property insurance, and sales tax, the purchase price totaled $1,234.80. Thus far the plaintiffs have paid $619.88 toward their purchase. The defendant claims that with various added credit charges paid for an extension of time there is a balance of $819.81 still due from the plaintiffs. The uncontroverted proof at the trial established that the freezer unit, when purchased, had a maximum retail value of approximately $300. The question is whether this transaction and the resulting contract could be considered unconscionable within the meaning of section 2-302 of the Uniform Commercial Code which provides in part:
“ (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
“ (2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination. ’? (L. 1962, ch. 553, eff. Sept. 27, 1964.).
There was a time when the shield of caveat emptor would protect the most unscrupulous in the marketplace ■ — a time when the law, in granting parties unbridled latitude to make their own contracts, allowed exploitive and callous practices which shocked the conscience of both legislative bodies and the courts.
The effort to eliminate these practices has continued to pose a difficult problem. On the one hand it is necessary to recognize the importance of preserving the integrity of agreements and the fundamental right of parties to deal, trade, bargain, and contract. On the other hand there is the concern for the uneducated and often illiterate individual who is the victim of gross inequality of bargaining power, usually the poorest members of the community.
Concern for the protection of these consumers against overreaching by the small but hardy breed of merchants who would prey on them is not novel. The dangers of inequality of bargaining power were vaguely recognized in the early English common law when Lord Habdwioke wrote of a fraud, which *191 “ may be apparent from the intrinsic nature and subject of the bargain itself; such as no man in his senses and not under delusion would make The English authorities on this subject were discussed in Hume v. United States (132 U. S. 406, 411 [1889]) where the United States Supreme Court characterized (p. 413) these as “ cases in which one party took advantage of the other’s ignorance of arithmetic to impose upon 'him, and the fraud was apparent from the face of the contracts.”
The law is beginning to fight back against those who once took advantage of the poor and illiterate without risk of either exposure or interference. From the common-law doctrine of intrinsic fraud we have, over the years, developed common and statutory law which tells not only the buyer but also the seller to beware. This body of laws recognizes the importance of a free enterprise system but at the same time will provide the legal armor to protect and safeguard the prospective victim from the harshness of an unconscionable contract.
Section 2-302 of the Uniform Commercial Code enacts the moral sense of the community into the law of commercial transactions. It authorizes the court to find, as a matter of law, that a contract or a clause of a contract was ‘ ‘ unconscionable at the time it was made ”, and upon so finding the court may refuse to enforce the contract, excise the objectionable clause or limit the application of the clause to avoid an unconscionable result. “ The principle ”, states the Official Comment to this section, “ is one of-the prevention of oppression and unfair surprise It permits a court to accomplish directly what heretofore was often accomplished by construction of language, manipulations of fluid rules of contract law and determinations based upon a presumed public policy.
There is no reason to doubt, moreover, that this section is intended to encompass the price term of an agreement. In addition to the fact that it has already been so applied (Matter of State of New York v. ITM, Inc., 52 Misc 2d 39; Frostifresh Corp. v. Reynoso, 52 Misc 2d 26, revd. 54 Misc 2d 119; American Home Improvement v. MacIver, 105 N. H. 435), the statutory language itself makes it clear that not only a clause of the contract, but the contract in toto, may be found unconscionable as a matter of law. Indeed, no other provision of an agreement more intimately touches upon the question of unconscionability than does the term regarding price.
Fraud, in the instant case, is not present; nor is it necessary under the statute. The question which presents itself is whether or not, under the circumstances of this case, the sale of a freezer unit having a retail value of $300 for $900 ($1,439.69 including *192 credit charges and $18 sales tax) is unconscionable as a matter of law. The court believes it is.
Concededly, deciding the issue is substantially easier than explaining it. No doubt, the mathematical disparity between $300, which presumably includes a reasonable profit margin, and $900, which is exorbitant on its face, carries the greatest weight. Credit charges alone exceed by more than $100 the retail value of the freezer. These alone, may be sufficient to sustain the decision. Yet, a caveat is warranted lest we reduce the import of section 2-302 solely to a mathematical ratio formula. It may, at times, be that; yet it may also be much more. The very limited financial resources of the purchaser, known to the sellers at the time of the sale, is entitled to weight in the balance. Indeed, the value disparity itself leads inevitably to the felt conclusion that knowing advantage was taken of the plaintiffs. In addition, the meaningfulness of choice essential to the making of a contract can be negated by a gross inequality of bargaining power. (Williams v. Walker-Thomas Furniture Co., 350 F. 2d 445.)
There is no question about the necessity and even the desirability of installment sales and the extension of credit. Indeed, there are many, including welfare recipients, who would be deprived of even the most basic conveniences without the use of these devices. Similarly, the retail merchant selling on installment or extending credit is expected to establish a pricing factor which will afford a degree of protection commensurate with the risk of selling to those who might be default prone. However, neither of these accepted premises can clothe the sale of this freezer with respectability.
Support for the court’s conclusion will be found in a number of other eases already decided. In American Home Improvement v. MacIver (supra) the Supreme Court of New Hampshire held that a contract to install windows, a door and paint, for the price of $2,568.60, of which $809.60 constituted interest and carrying charges and $800 was a salesman’s commission was unconscionable as a matter of law. In Matter of State of Neto York v. ITM, Inc. (supra) a deceptive and fraudulent scheme was involved, but standing alone, the court held that the sale of a vacuum cleaner, among other things, costing the defendant $140 and sold by it for $749 cash or $920.52 on time purchase was unconscionable as a matter of law. Finally, in Frostifresh Corp. v. Reynoso (supra) the sale of a refrigerator costing the seller $348 for $900 plus credit charges of $245.88 was unconscionable as a matter of law.
*193 One final point remains. The defendant argues that the contract of June 15, 1966, upon which this suit is based, constitutes a financing agreement and not a sales contract. To support its position, it points to the typed words 1 ‘ Refinance of Freezer A/C #6766 and Food A/C #56788 ” on the agreement and to a letter signed by the plaintiffs requesting refinance of the same items. The request for “ refinancing ” is typed on the defendant’s letterhead. The quoted refinance statement is typed on a form agreement entitled “ Star Credit Corporation — Retail Instalment Contract ”. It is signed by the defendant as “ seller ” and by the purchasers as “ buyer ”. Above the signature of the buyers, they acknowledge ‘ ‘ receipt of an executed copy of this RETAIL instalment contract ’ ’. The June 15, 1966 contract by defendant is on exactly the same form as the original contract of August 31, 1965. The original, too, is entitled “ Star Credit Corporation — Retail Instalment Contract ”. It is signed, however, by “Your Shop At Home Service, Inc.” Printed beneath the signatures is the legend ‘1 Duplicate for Star ”. In substance and effect, the agreement of June 25, 1966 constitutes a novation and replacement of the earlier agreement. It is, in all respects, as it reads, a ‘ ‘ Retail Instalment Contract ’ ’.
Having already paid more than $600 toward the purchase of this $300 freezer unit, it is apparent that the defendant has already been amply compensated. In accordance with the statute,, the application of the payment provision should be limited to amounts already paid by the plaintiffs and the contract be reformed and amended by changing the payments called for therein to equal the amount of payment actually so paid by the plaintiffs.