GEORGE F. KUGLER, JR., ATTORNEY GENERAL OF NEW JERSEY, PLAINTIFF, v. RICHARD ROMAIN, INDIVIDUALLY AND t/a EDUCATIONAL SERVICES CO., DEFENDANT.

Superior Court of New Jersey
Chancery Division

Decided June 10, 1970.

472

*Mr. Douglas J. Harper,* Deputy Attorney General, for plaintiff.

*Mr. Richard Romain,* a member of the New York bar, attorney *pro se,* and *Mr. Nathan N. Goldberg,* for defendant.

*Mr. James D. Coffee,* Director, New Jersey State Office of Legal Services, filed an *amicus curiae* brief (*Mr. Carl R. Lobel* on the brief).

MINTZ, J. S. C. This proceeding is brought by the Attorney General pursuant to *N. J. S. A.* 56:8–1 *et seq.,* hereinafter referred to as the "Consumer Protection Act." He alleges defendant's business operation to be violative of *N. J. S. A.* 56:8–2, which in part provides:

The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression. or omission of any material fact with intent that others rely upon such concealment. suppression or omission, in connection with the sale or advertisement of any merchandise or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice; * * *.

*N. J. S. A.* 56:8–8 in part reads as follows:

Whenever it shall appear to the Attorney General that a person has engaged in, is engaging in or is about to engage in any practice declared to be unlawful by this act he may seek and obtain in an action in the Superior Court an injunction prohibiting such person from continuing such practices or engaging therein or doing any acts in furtherance thereof * * *. The court may make such orders or judgments as may be necessary to prevent the use or employment by a person of any prohibited practices, or which may be necessary to restore to any person in interest any moneys or property, real or personal which may have been acquired by means of any practice herein declared to be unlawful.

Plaintiff seeks (1) injunctive relief pursuant to *N. J. S. A.* 56:8–8 as to the specific practices allegedly violative of *N. J. S. A.* 56:8–2; (2) a declaration that the price terms of the contracts in question are fraudulent *per se* and unconscionable, being violative of *N. J. S. A.* 56:8–2 and *N. J. S. A.* 12A:2–302; (3) restoration orders pursuant to *N. J. S. A.* 56:8–8 for the benefit of the purchasers who testified with respect to the allegedly fraudulent practices of defendant's

representatives; (4) rescission of all contracts between purchasers listed on the schedule attached to the complaint and defendant, notwithstanding some of these purchasers did not testify in these proceedings; (5) assessment of civil penalties against defendant, as provided for in *N. J. S. A.* 56:8–13, 14, and (6) an order enjoining defendant from doing business in New Jersey until registration of his trade name is effected in accordance with *N. J. S. A.* 56:1–2.

Defendant Romain, a member of the bar of the State of New York, operates a business principally in the States of New York and New Jersey known as Educational Services Co. The office of this company is in New York. The business consists of solicitation and sale of certain educational books and related materials effected through sales personnel selected and trained by defendant or his office manager in New York. The sales contracts used by these sales people refer to "a complete ten-year educational program." Defendant commenced operation in New Jersey in January 1965. A "crew leader," presumably a representative who has been with defendant for some period of time, transports a group of sales representatives by car to New Jersey. Defendant's sales force fluctuates. He engages a greater number in the summer months, during which the sales force approximately 30 to 35 persons. The geographical area where sales are solicited is selected by the crew leader. Upon arrival at a designated point in New Jersey, the salesmen or women undertake to canvass the selected area by a house-to-house solicitation without any prior notice to the prospects. At the end of the day they meet at a designated spot for their return trip to New York. Actual sales solicitations are effected primarily in urban areas of this State and directed towards low income families.

The basic "Educational Package" offered by defendant consists of the following materials:

1. "Questions Children Ask" (1 vol.);
2. "Child Horizons" (4 vols.);
3. "New Achievement Library" (5 vols.);
4. "High School Subjects Self-Taught" (4 vols.);

5. "Science Library" (1 Vol.);
6. "Play-Way" French and Spanish records, and
7. Flash card set.

In many of the contracts there is also included a volume entitled "Negro History." Additionally, certain bonus volumes are afforded the purchaser upon final payment. Ten annual supplementary volumes are integral parts of the sales package. The total cash sales price for the above stated package is $249.50, and the time sales price is $279.95. No one purchases for cash. The cost of the ten annual supplements is passed on directly to the purchaser via a $2.94 annual charge paid along with the submission of certain coupons. The time sales price includes a delivery charge of $17.99 and a credit service charge of $12.46. The contract calls for the down-payment of $9 with the balance of the time sales price payable in 24 equal monthly installments of $11.50.

There was some dispute with respect to the base cost of the entire package. Defendant testified that the cost to him of the basic package came to $38.35; that the average cost of the bonus item furnished the customer who paid in full was $8, and that the annual loss experience over a ten-year period in furnishing the annual supplements based upon a 40% exercise of this privilege came to $7, making a total base cost for the "package" of approximately $53.35. The figure is high, and considering all the testimony presented it would appear that a figure of perhaps $35 to $40 is more accurate.

Defendant pays its salesmen strictly on a commission basis. The amount of the commission paid on each sale ranges from $16.50 to $33.00, depending upon whether the following four points are satisfied: (1) securing of a down payment of $9.00; (2) securing a consumer's home phone number; (3) securing a consumer who is not self-employed, and (4) securing a consumer who has been employed for 1½ years. In order to qualify for the full commission, the salesman must satisfy three of the four points. In the vast

majority of cases the commission paid on each sale averaged about $16.50. The crew leader also works on a commission basis and additionally receives an over-ride commission of $5 on every approved order submitted by a member of his crew.

The proofs abundantly support the finding that deceptive and fraudulent practices prohibited by *N. J. S. A.* 56:8-2 have been perpetrated by the defendant's sales representatives upon each of the 24 consumers who testified. The cited statute specifically provides that a showing of damage is not a prerequisite for the finding of a violation. Consequently the fact that some consumers have not been damaged is of no moment.

I am mindful of the contrary testimony offered by the defendant and his witnesses. I simply did not believe them. I was particularly unimpressed by the testimony of Miss Florence Yeoman, a lady who has taught school for many years and who categorically denied making any misrepresentations. She still is in the defendant's employ. She impressed me as a polished, suave, over-talkative lady who would not hesitate to misrepresent in order to induce the execution of a contract.

*N. J. S. A.* 56:8-2 specifically applies to "any person" who utilizes the practices therein prohibited. *N. J. S. A.* 56:8-1(d). Defendant contends that he did not participate in any prohibited sales practices and that if any in fact occurred, they were committed by independent contractors. He argues that he cannot be responsible for their acts. Alternatively, defendant asserts that if the sales personnel were his agents, they were not authorized to misrepresent and therefore he cannot be held accountable.

I am satisfied that the sales representatives were defendant's agents. The contention that they were independent contractors is without merit. See *Colegrove v. Behrle,* 63 *N. J. Super.* 356 (App. Div. 1960). The sales people were employed by defendant for the sole purpose of representing him in transactions arising out of his business. They made

no investment of capital incident to a separate business and assumed no financial business risks. An agency relationship must be determined in the light of the totality of the facts. The form contract used by defendant shows a recognition of defendant's responsibility in that the name of defendant Educational Service Company, with its address and phone number, appears on its heading. The sales personnel sign the contracts as "representatives" of defendant. The absence of direct control over the sales representatives regarding the manner in which they solicit business is insignificant in the overall view of the circumstances. 2 *C. J. S. Agency* § 2, at 1027–1028 (1936); *cf. Andryishyn v. Ballinger*, 61 *N. J. Super.* 386, 391 (App. Div. 1960), certif. den. *Andryishyn v. Bayonne Block Co.*, 33 *N. J.* 120 (1960); *DeMonaco v. Renton*, 18 *N. J.* 352, 357 (1955).

Defendant denies authorizing the sales personnel to engage in any fraudulent practices. A principal is accountable for the authorized acts of his agent and for any acts which he may have ratified. The testimony indicates that defendant was apprised of the misrepresentations committed by two of his key sales representatives, Miss Florence Yeoman and a Martin Gross. He took no affirmative action against them. Also, in some instances defendant personally applied pressure tactics in attempting to make collections after being informed of the consumers' complaints. While I am mindful of the testimony that at no time did defendant instruct his representatives to misrepresent, I am satisfied that the vast number of complaints received from consumers and the resistance to his demands for payment (defendant initiated suit in approximately 70% of the contracts with New Jersey consumers) made him fully aware of the repeated fraudulent practices.

Authority can be shown by express agreements between principal and agent. But it can also be inferred from the course of dealing between the two. All authority must be traced to the principal and may be found in his adoption of, or acquiescence in, similar acts done on other occasions

by the agent. *Restatement, Agency* 2d, § 43, at 133–134 (1958). Authority is found in defendant's knowledge of, and acquiescence in, repeated deceptions by his sales personnel. Alternatively, as to the vast majority of purchasers who have paid moneys to Romain, I find that he has ratified those transactions and is responsible for them. Defendant cannot escape responsibility if he accepts and retains the "fruits" of the fraud. *Tams v. Abrams,* 120 *N. J. Eq.* 253, 257–258 (E. & A. 1936); *Mechanics' Trust Co. of New Jersey v. Reid,* 117 *N. J. Eq.* 472, 473 (E. & A. 1934); *Security Aluminum Window Mfg. Corporation v. Lehman Associates, Inc.,* 108 *N. J. Super.* 137, 146–147 (App. Div. 1970); 37 *C. J. S. Fraud* § 61, at 349, 350 (1943).

The Attorney General is entitled to injunctive relief pursuant to *N. J. S. A.* 56:8–8. Defendant will be enjoined from continuing or engaging in any fraud or deception in connection with the execution of any contract and from acquiescing in or ratifying any fraud, deception or misrepresentation practiced by any of his sales representatives in connection with any transactions in his behalf.

 Plaintiff further contends that the sales price charged by the defendant is unconscionable and fraudulent and, as such, violative of *N. J. S. A.* 56:8–2. As already noted, the standard form contract presently used by defendant calls for a cash sales price of $249.50 and a time sales price of $279.95 for the basic books and materials which cost him between $35 and $40, exclusive of salesmen's commissions and overhead. While the sales price appears to be excessive, I cannot say that such exorbitance *per se* constitutes a fraud. *Cf. Jones v. Star Credit Corp.,* 59 *Misc.* 2d 189, 298 *N. Y. S.* 2d 264, 266 (Sup. Ct. 1969). In the absence of any deceptive practice by the seller, the transaction cannot be vitiated under *N. J. S. A.* 56:8–2. Where the wording of a statute is clear and explicit, courts are not permitted to indulge in any interpretation other than that called for by the express words set forth. *Duke Power Co. v. Patten,* 20 *N. J.* 42, 49 (1955).

■ The Attorney General requests a declaration that defendant's standard form contract, which includes the alleged grossly excessive sales price, is unconscionable and unenforceable under the Uniform Commercial Code (*N. J. S. A.* 12A:2–302). This statute provides that the court may refuse to enforce an unconscionable contract or an unconscionable clause in a contract. It further provides that when it is claimed that the contract or any clause thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination. The Attorney General alleges that he is empowered to invoke *N. J. S. A.* 12A:2–302 in behalf of all purchasers who have signed the standard form contract. This assertion is predicated upon *N. J. S. A.* 52:17A–4(h), which vests power in the Attorney General to

Enforce the provisions of the Constitution and all other laws of the State, as well as perform all other duties conferred and imposed by law upon the Attorney-General.

Under this general grant our courts have recognized the right of the Attorney General to initiate or to intervene in law suits for the protection of the public interest. 19 *Rutgers L. Rev.* 187, 251, 252 (1964–65), and cases cited therein. However, the Attorney General is not a proper party to a private controversy. *Trenton Saving Fund Society v. Wythman,* 104 *N. J. Eq.* 271 (Ch. 1929), rev'd on other grounds 106 *N. J. Eq.* 93 (E. & A. 1930). The unconscionability of a contract or a clause in a contract within the purview of *N. J. S. A.* 12A:2–302 is strictly a matter of private concern and cannot be asserted by the Attorney General.

In *State of New York by Lefkowitz, Attorney General v. ITM, Inc.,* 52 *Misc.* 2d 39, 275 *N. Y. S.* 2d 303 (Sup. Ct. 1966) the court determined that defendants' sales scheme involving excessively high prices was violative of the Execu-

tive Law, § 63, subdiv. 12, and was unenforceable. That statute, insofar as pertinent, reads:

> Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney-general may apply * * * for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts * * * and the court may award the relief applied for or so much thereof as it may deem proper. The word "fraud" or "fraudulent" as used herein shall include any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or *unconscionable contractual provisions*. (Emphasis supplied)

It further upheld the Attorney General's contention that the contracts in question were unconscionable within the meaning of the Uniform Commercial Code, § 2–302, and were unenforceable. Suffice it to say that *State of New York by Lefkowitz, supra,* is distinguishable from the instant case in that § 63, subdiv. 12 of the Executive Law of New York, under which the proceeding was instituted, specifically prohibits "unconscionable contractual provisions." Since *N. J. S. A.* 56:8–2 does not presently include such a provision and the Attorney General may not invoke *N. J. S. A.* 12A:2–302, I cannot in this proceeding make the determination of price unconscionability asked for by plaintiff. Furthermore, since I have concluded that in every instance in which a purchaser testified the transaction with him or her was in violation of *N. J. S. A.* 56:8–2, a determination of price unconscionability with respect to these transactions would appear to be unnecessary. *Cf. Toker v. Perl,* 103 *N. J. Super.* 500 (Law Div. 1968), aff'd 108 *N. J. Super.* 129 (App. Div. 1970).

As already noted, plaintiff requests that orders be entered pursuant to *N. J. S. A.* 56:8–8 restoring to the various consumers moneys paid to defendant on account of transactions hereinbefore considered and determined to be violative of *N. J. S. A.* 56:8–8. At the conclusion of the trial plaintiff abandoned his claim for restoration orders in be-

half of consumers listed on the schedule annexed to the complaint who did not testify in this proceeding. We are here concerned with three categories of consumers, namely: (1) those who entered into contracts with defendant and through the services of a Legal Aid attorney effected a settlement with him; (2) consumers against whom default judgments have been entered and payments made as a result of garnishments, and (3) consumers who entered into contracts but suffered no loss as a result thereof.

As to the first category, there will be no restoration orders entered. Although this court has concluded that misrepresentations were made to these consumers in connection with the sale of the materials in question, they had the benefit of counsel and voluntarily effected settlement agreements. It is settled law that an executory settlement agreement between the parties, fairly arrived at to settle pending litigation, may be specifically enforced in that cause. *Jannarone v. W. T. Co.*, 65 *N. J. Super.* 472 (App. Div. 1961), certif. den. *Jannarone v. Calamoneri*, 35 *N. J.* 61 (1961); *De Caro v. De Caro*, 13 *N. J.* 36 (1953). It necessarily follows that the fully performed voluntary settlement agreements with which we are here concerned, effectuated through counsel with full knowledge of the material facts, should not be disturbed.

As to the second category, in which default judgments have been entered against the purchasers, defendant argues that the validity of the contracts has been adjudicated and these matters are *res judicata*. A judgment of a court of competent jurisdiction is, so long as it stands unreversed, conclusive upon the parties and their privies, not only as to all matters which were actually litigated but also as to all matters which might have been properly raised in the prior suit. *Reeves v. Jersey City*, 30 *N. J. Super.* 392 (App. Div. 1954), aff'd o. b. 16 *N. J.* 529 (1954); *Newark v. North Jersey District Water Supply Comm'n*, 106 *N. J. Super.* 88 (Ch. Div. 1968), aff'd o. b. 54 *N. J.* 258 (1969). In any event, defendant contends that the Attorney General may not

collaterally attack these judgments and that application for relief from any judgment must be made in the court which rendered the judgment. *R.* 4:50–1; *R.* 6:6–1. Yet it has also been held that this court has the power in a "proper case" to entertain an independent action to relieve a party from a judgment. *Shammas v. Shammas,* 9 *N. J.* 321 (1952); *Newark v. North Jersey District Water Supply Commission, supra.*

The Attorney General in this independent proceeding challenges the validity of the default judgments obtained by defendant against the various witnesses. The attack is a collateral attack because any attempt in a separate and independent proceeding to question the integrity and validity of any adjudication in another proceeding and challenge its existence as valid constitutes a collateral attack. *Catabene v. Wallner,* 16 *N. J. Super.* 597 (App. Div. 1951). But, as observed in that case, all collateral attacks on judgments are not barred.

There was presented in this case testimony respecting a regular systematic business pattern embodying practices violative of a legislative mandate for consumer fair treatment. In no instance did any of the purchasers who testified have his day in court. Perhaps this was due to sheer neglect. But whatever the reason, the question is whether the public policy of this state should be frustrated. The policy considerations precluding collateral attacks upon judgments are similar to those behind the doctrine of *res judicata.* In *Desmond v. Kramer,* 96 *N. J. Super.* 96, 107 (Cty. Ct. 1967) the court approvingly quoted the following excerpt from *Coca-Cola v. Pepsi-Cola Co.,* 36 *Del.* 124, 172 *A.* 260 (Sup. Ct. 1934):

"The doctrine of *res judicata* is primarily one of public policy and only secondarily of private benefit to individual litigants. It draws its strength not so much from the private advantage of the party seeking to invoke it, but its roots lie in the principle that public policy and welfare require a definite end to litigation when each of the parties has had a full, free and untrammelled opportunity of presenting all of the facts pertinent to the controversy. The primary object of *res judicata* (public policy) is based upon the maxim *reipublicae ut*

*sit finis litium* — it concerns the commonwealth that there be a limit to litigation. * * *"

The principle of finality of judgments is not an absolute rule and must be weighed in the balance with the equally salutary principle that justice should be done in every case. *Hodgson v. Applegate,* 31 *N. J.* 29, 43 (1959). *Cf. State ex rel. Hilgendorff v. American Can Co.,* 42 *N. J.* 32, 40 (1964), *cert.* den. 379 *U. S.* 826, 85 *S. Ct.* 53, 13 *L. Ed.* 2d 36 (1964); *Cronheim v. Tennant,* 30 *N. J.* 360, 371 (1959). The doctrine of *res judicata* and the rule prohibiting collateral attacks may be rendered inoperative by considerations of legislative policy. *Kalb v. Feuerstein,* 308 *U. S.* 433, 60 *S. Ct.* 343, 84 *L. Ed.* 370 (1940); *Mercoid Corp. v. Mid-Continent Investment Co.,* 320 *U. S.* 661, 64 *S. Ct.* 268, 88 *L. Ed.* 376 (1943).

The Consumer Protection Act was apparently enacted for the purpose of thwarting itinerant operators from perpetrating deceptive business practices upon prospective innocent purchasers and authorizes the Attorney General to combat practices violative of *N. J. S. A.* 56:8–2. Under the circumstances here presented, the legislative mandate authorizing the court to restore moneys to victimized consumers overrides the policy favoring the finality of default judgments. Accordingly, defendant will be ordered to forthwith pay to the following parties:

| | |
|---|---:|
| Yvonne J. Herndon | $ 5.00 |
| John Seaman | 492.00 |
| Lottie Pollard and her husband | 136.00 |
| Betty Leary | 343.00 |
| Eula Brown and her husband | 245.85 |
| Vera Sewell and her husband | 135.00 |
| Judith Anne Curcio and her husband | 14.00 |
| Evelyn Walker | 6.00 |

He who seeks equity must do equity. The court, in ordering defendant to repay to the various purchasers the funds received by him, has rescinded each of the contracts.

The purchasers should, upon receiving repayment, return such books and materials as they have to defendant, restoring him as much as possible to the *status quo*. Of course, some of the books or materials may have become soiled or lost, but the inability of the purchasers to make complete restoration to defendant will not bar the right to the recovery of the amounts to which I find they are entitled.

 Defendant is directed to cause to be entered in the county district courts in which the respective default judgments were entered cancellations of said judgments. Defendant is further enjoined from instituting any action for the recovery of moneys from any consumers who testified in this cause.

 I also find that defendant is subject to civil penalties pursuant to *N. J. S. A.* 56:8–13, which provides:

> Any person who violates any of the provisions of the act to which this act is a supplement shall, in addition to any other penalty provided by law, be liable to a penalty of not less than $50.00 or more than $100.00 for the first offense and not less than $100.00 or more than $250.00 for the second and each subsequent offense.

Collection and enforcement of the penalties is prescribed by *N. J. S. A.* 56:8–14 as follows:

> Every county district court and municipal court shall have jurisdiction of proceedings for the collection and enforcement of a penalty imposed because of the violation, within the territorial jurisdiction of the court, of any provision of the act to which this act is a supplement. The penalty shall be collected and enforced in a summary proceeding pursuant to the Penalty Enforcement Law (N. J. S. 2A:58-1, et seq.). Process shall be either in the nature of a summons or warrant and shall issue in the name of the State, upon the complaint of the Attorney General or any other person.

*N. J. S. A.* 56:8–3.1 (*L.* 1967, *c.* 97, § 1, effective June 8, 1967) empowers the Attorney General or his assistant to hold hearings and, upon finding a violation, to assess a penalty within the limits of *N. J. S. A.* 56:8–13 against the person

who committed such violation. It is urged that this court has no jurisdiction to assess penalties. Prior to the enactment of *N. J. S. A.* 56 :8–3.1 the only forum available for the assessment and collection of the penalty was the court. *Cf. O'Dowd's Dairy v. Hoffman*, 52 *N. J. Super.* 135 (App. Div. 1958). Clearly, the intendment of this supplement (*N. J. S. A.* 56 :8–3.1) to the Consumer Protection Act was to provide an alternative proceeding and not to deprive the court of the jurisdiction vested in it pursuant to *N. J. S. A.* 56 :8–13.

■ *N. J. S. A.* 56 :8–14 is not a bar to the jurisdiction of this court. As already noted, this court has granted injunctive relief and restoration orders. It is appropriate in this proceeding to entertain the demand of the Attorney General for the imposition of penalties. The prime aim of the new practice is the just and expeditious determination in a single action of the ultimate merits of an entire controversy between litigants. *Falcone v. Middlesex County Medical Society*, 47 *N. J.* 92 (1966); *Newark v. North Jersey District Water Supply Comm'n, supra.* The court heard testimony with respect to 24 contracts and concluded that in all instances the contracts were induced by defendant through practices violative of *N. J. S. A.* 56 :8–2. As already noted, defendant was apprised of the misrepresentations and pressure tactics of his representatives in which he acquiesced. He also used his own pressure tactics in refusing to cancel the contracts and in insisting upon payments from the victimized purchasers. Accordingly, he will be subjected to a penalty of $100 for each offense for a total of $2400. Defendant is directed to pay said sum to the Clerk of the Superior Court, who will remit the same to the State Treasurer. *N. J. S. A.* 56 :8–13; *N. J. S. A.* 2A :58–8.

A suit for statutory penalties is neither criminal nor *quasi*-criminal in nature, but civil. "Such offenses are punishable as the name implies, by *penalties.*" *Sawran v. Lennon*, 19 *N. J.* 606, 612 (1955). It matters not that in some instances the purchasers suffered no loss, and in others voluntary settlements were effected. The fact remains that defendant was

found to have committed 24 "offenses" for which he is answerable to the State.

Defendant admits that he has not complied with *N. J. S. A.* 56:1-2, which requires the filing of a certificate of his trade name, "Educational Services Co.," before conducting any business in New Jersey. The cited statute provides that the certificate shall set forth the name under which the business is conducted and the true name of the person conducting the same, with his post office address. The purpose of this statute is to protect persons giving credit to the firm on the faith of the fictitious designation. *Rutkowsky v. Bozza,* 77 *N. J. L.* 724 (E. & A. 1909) ; *Donner v. Parker Credit Corp.,* 10 *N. J. Super.* 350 (Ch. Div. 1950). A violation of this statute is a misdemeanor. *N. J. S. A.* 56:1-4.

Ordinarily, a court of equity will not enjoin a violation of a criminal statute. *Baird v. Board Recreation Comm'rs, South Orange,* 110 *N. J. Eq.* 603, 605 (E. & A. 1932). Such violations are left to the agencies charged with the enforcement of the criminal law. *Trisolini v. Meltsner,* 23 *N. J. Super.* 204 (App. Div. 1952). In the absence of special statutory jurisdiction, where the grievance is subject to indictment, equity interferes with great reluctance even though its intervention be sought by the Attorney General, and then only to prevent a very serious public injury. *Raritan Tp. v. Port Reading R. R. Co.,* 49 *N. J. Eq.* 11 (Ch. 1891) ; *cf. Mayor and Council of Alpine Borough v. Brewster,* 7 *N. J.* 42 (1951). This case does not present such an injury. The remedy by indictment, if invoked, appears sufficient to rectify the situation. Accordingly, injunctive relief enjoining the defendant from engaging in business in New Jersey pending registration of his trade name will be denied.