**LEASING SERVICE CORPORATION,**
Plaintiff,

v.

**Ralph E. BROETJE, Don L. Chappell, Richard J. Carman, Betty J. Carman, Deanna V. Chappell, John W. Carman, and Jeannie Carman, Defendants.**

**No. 81 Civ. 6436(CES).**

United States District Court,
S. D. New York.

Aug. 10, 1982.

364

Sol D. Bromberg, New York City, for plaintiff.

Gerald A. Novack, Barrett Smith Schapiro Simon & Armstrong, Joseph P. Callahan, Callahan & Wolkoff, P. C., New York City, for defendants.

## MEMORANDUM DECISION

STEWART, District Judge:

Plaintiff Leasing Service Corporation ("LSC") brought this contract action in diversity against Ralph E. Broetje, Don L. Chappell, Richard J. Carman, Betty J. Carman, Deanna V. Chappell, John W. Carman, and Jeannie Carman. LSC is a New York corporation. Richard and Betty Carman are residents of Idaho. All other defendants are residents of the State of Washington. The case concerns the lease of a Driltech D40K water well drilling rig ("the rig" or "the equipment") by LSC's assignor to Don Chappell and the transfer of the lease to Broetje. The other defendants are guarantors of Chappell's original contract, each of whom approved the transfer to Broetje in writing. After defendants defaulted on the payments, LSC repossessed and sold the equipment at an auction at which LSC itself was the only bidder. LSC sued for the alleged unpaid balance of the contract, late charges and attorney's fees.

The defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b) or in the alternative to dismiss or to transfer the action to the Eastern District of Washington pursuant to 28 U.S.C. § 1404. Broetje claims that he was induced to sign the transfer agreement through fraud so the lease is unenforceable. Defendants allege that the lease is unenforceable because its provisions are unconscionable. They also allege that the sale of the rig by LSC was commercially unreasonable, and that process and notice of the sale were insufficient. LSC cross-moves for summary judgment. LSC claims that the transfer agreement, the lease, and subsequent sale of the rig were neither induced by fraud, nor unconscionable, nor unreasonable and that venue is properly laid in the Southern District of New York pursuant to the lease's venue selection clause, which it asserts is valid and binding.

I

In considering defendants' motion to dismiss, we accept the factual allegations of the complaint as true. However, the complaint unquestionably states a claim for relief. Defendants do not dispute the existence of the lease or transfer agreement and do not deny their default. Instead, defendants seek to defeat enforcement of the various agreements. It is thus necessary to review the undisputed facts for the purposes of ruling on LSC's cross-motion for summary judgment. LSC bears the burden of demonstrating the absence of material issues of fact. See American Int'l Group, Inc. v. London Am. Int'l Corp. Ltd., 664 F.2d 348, 351 (2d Cir. 1981).

On January 27, 1978, Lynnwood Equipment, Inc. ("Lynnwood") leased a water well drilling rig to Don Chappell. By the same instrument Lynnwood assigned the lease to LSC, a nationwide finance company. The lease price was $340,380.00, payable in 57 monthly installments, and the lease was guaranteed by Deanna Chappell, John and Jeannie Carman, and by John Carman's parents, Richard and Betty Carman.

The original lease, a densely-worded form contract, contained many different creditor's remedies. The entire outstanding balance would become due upon default. Late charges of 1/15th of 1% per day (24.33% annually) accrued on past due payments. The lease also provided for liquidated damages equal to 15% of the total rent, attorney's fees of 20% of "any amount sought", appointment of attorney-in-fact for service, confession of judgment (except where prohibited by law), waiver of jury trial and

right to hearing prior to repossession, and waiver and release of relief from any appraisement, stay or exemption laws. Chappell was given a purchase option for the equipment, also dated January 27, 1978, at a price of $25,966 (7% of the lease price) on expiration of the lease. The lease designated venue and jurisdiction in any New York State court. Novack Aff. Ex. A, p. 2. The guaranty agreements signed by Deanna Chappell and by the Carmans provide for their joint and several liability for the payments due under the contract. They also contain many of the creditor's remedies in the lease.

In the spring of 1978, Ralph Broetje, a farmer near Yakima, Washington, desired to have a water well dug on his property to irrigate his farm. Finding most well drillers already committed to other jobs, Broetje determined that he would have a long wait unless he could find an available drilling rig. Broetje eventually contacted John Carman, who had sublet Chappell's rig. John Carman was not then using the rig and wanted to dispose of it. Broetje learned that Dave Carman wanted to use the rig in his business.

Lynnwood's sales manager, Bob Freeman, arranged a meeting with Broetje and John Carman. At the meeting Broetje signed a "Transfer and Assumption Agreement" ("transfer agreement"). He was not asked to and did not sign the original lease. Indeed, Broetje claims and LSC does not deny that Freeman told him not to read the original lease and did not give him a copy of it. Broetje Aff. ¶¶ 18–21; Novack Aff. ¶ 9.

The transfer agreement, also a densely-worded form document, provided that Transferee (Broetje) would assume and become a party to the lease "as though Transferee were to all intents and purposes the purchaser or lessee named in the contract...." Novack Aff., Ex. B. It also provided that Chappell remained liable on the contract, that Broetje waived, as to LSC, any defense, set off, recoupment claim or counterclaim that he might have against Chappell, maintained LSC's security interest in the equipment and granted LSC a further security interest in "all equipment, inventory, goods, and property of every kind now owned and/or hereafter required by Transferee [Broetje]". *Id.*

Following the transfer from Chappell to Broetje, Dave Carman did use the rig, but allegedly due to frequent breakdowns of the equipment, Dave Carman stopped making payments to Broetje after a short time. Broetje Aff. ¶¶ 22–26. Broetje made regular payments to LSC until August 1980 when he fell behind in his payments. He continued making payments through January 1981. LSC's Statement Pursuant to Rule 3(g) ¶ 7.

In late July 1981, LSC sent letters to each defendant stating that the rig would be sold at auction. LSC also placed advertisements (costing $298.80) to that effect in the Tri-City Herald of Pasco, Washington and Contractors Hot Line. LSC Statement Pursuant to Rule 3(g) ¶ 11. On August 19, 1981, LSC conducted a public auction (without auctioneer) at which only LSC and Lynnwood were present and LSC was the only bidder. LSC purchased the rig for $50,000.[1]

LSC now sues for the unpaid balance of $119,133, for late charges ($17,633.02), and for attorney's fees ($26,765.14). The credit of $50,000 (the sale price of the rig) against the amount owed was wiped out by reducing it by liquidated damages ($51,047). The total for which defendants are alleged to be liable is $213,531.16, of which $160,590.84 (plus interest) is alleged to be unpaid.[2]

---

1. Broetje alleges that Jack Graff, vice president of LSC's sister company, Credit Alliance, stated in a November 1981 telephone conversation that the value of the rig was $120,000 and that he had therefore refused an offer of $95,000. Broetje Aff. ¶¶ 35–36. Graff's affidavit denies that he received a "legitimate offer of $95,000" and that he ever stated that the value was $120,000. Graff Aff. p. 3.

2. In calculating damages alleged to be due, we have reached slightly different totals than has LSC. The differences are small and are probably due to clerical errors. We note this in the interests of accuracy.

## II

■ Issues of material fact remain as to Broetje's allegation that he was induced to enter the contract by LSC's fraudulent concealment of material facts. The elements of fraudulent concealment are: (1) a relationship between the contracting parties that creates a duty to disclose; (2) knowledge of the material facts by the party bound to make such disclosures; (3) non-disclosure; (4) scienter; (5) reliance; and (6) damage. *Fidenas AG v. Honeywell Inc.*, 501 F.Supp. 1029, 1039 (S.D.N.Y.1980). To show fraud based on a failure to disclose information, Broetje must, at a minimum, produce evidence that LSC knew that Broetje was acting under a mistaken belief with respect to a material fact. *Frigitemp Corp. v. Financial Dynamics Fund*, 524 F.2d 275, 283 (2d Cir. 1975). The element of scienter includes representations known to be untrue or made with a reckless indifference to error, with the intent to cause the other party to act in reliance upon them. *Ainger v. Michigan General Corp.*, 476 F.Supp. 1209, 1227 (S.D.N.Y.1979).

In support of his fraudulent concealment claim, Broetje states and LSC does not deny that Lynnwood's sales manager actively discouraged Broetje from looking at any documents other than the transfer agreement, telling Broetje that the transfer agreement was the only document which concerned him. Broetje Aff. ¶¶ 19–20; Novack Aff. ¶ 9. Although the transfer agreement incorporates the lease's provisions by reference, it does not reiterate any of the terms of the lease. It is undisputed that Broetje only signed the transfer agreement and did not sign the original lease. Broetje also alleges and LSC does not deny that Lynn-

wood's sales manager did not provide a copy of the original lease at the meeting at which Broetje signed the transfer agreement or at any time thereafter until he received the complaint in this case. Broetje Aff. ¶ 19; Novack Aff. ¶ 9. Broetje also avers that he would not have entered into the agreement if he had known of the various onerous lease clauses. These allegations raise material factual issues with respect to each element of the fraudulent concealment.[3]

## III

■ The defendants also allege that the lease is unenforceable because of unconscionability. Generally, an unconscionable agreement is one marked by an absence of meaningful choice on the part of one of the parties, together with contract terms that are unreasonably favorable to the other party. *Blake v. Biscardi*, 62 A.D.2d 975, 977, 403 N.Y.S.2d 544, 547 (1978) (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449–50 (D.C.Cir.1965)). Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. *Id.*, 403 N.Y.S.2d at 547. We should consider whether there was a gross inequality of bargaining power, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print and minimized by deceptive sales practices. *Id.* at 547. The purpose of the doctrine of unconscionability is to prevent oppression and unfair surprise. *Jones v. Star Credit Corp.*, 59 Misc.2d 189, 191, 298 N.Y.S.2d 264, 266

---

**3.** Even if we found that these facts did not permit an inference of Lynnwood's scienter, we might not enforce the lease provisions which Broetje did not know about. "A party should not be bound by clauses printed on the reverse side of a document unless it be established that such matter was properly called to its attention and that it assented to the provisions there stated." *Tri-City Renta-Car and Leasing Corp. v. Vaillancourt*, 33 A.D.2d 613, 614, 304 N.Y. S.2d 682, 684 (3d Dept. 1969) ("Tri-City"); *Arthur Phillip Export Corp. v. Leathertone, Inc.*, 275 A.D. 102, 105, 87 N.Y.S.2d 665, 667 (1949);

*Klar v. H. & M. Parcel Room*, 270 A.D. 538, 543, 61 N.Y.S.2d 285, 288 (1946), *aff'd*, 296 N.Y. 1044, 73 N.E.2d 912 (1947); *Dery v. Blate*, 209 A.D. 467, 471, 205 N.Y.S. 15, 19 (1st Dept. 1924), *aff'd*, 239 N.Y. 203, 146 N.E. 204 (1924); *Blossom v. Dodd*, 43 N.Y. 264, 270 (1870). If the finder of fact determines that Broetje did not know of the lease's provisions, and that they were not brought to his attention, as he claims, then under *Tri-City* he might not be bound by those provisions to which he did not assent—i.e., on which the parties' minds did not meet.

(1969) (quoting Official Comment to U.C.C. § 2–302).

■ Although the undisputed facts show that LSC is a large nationwide finance company and Broetje is a small Washington farmer, those facts standing alone do not necessarily substantiate a claim of unconscionability. Besides Broetje's statements that he did not consult a lawyer before signing the transfer agreement and that he knew little about the drilling business, there is no evidence as to his business acumen or as to the relative bargaining power of the parties. However, Broetje was presented with a form transfer agreement, providing for the incorporation by reference of a form lease which he claims never to have seen and which he was allegedly discouraged from examining. It is difficult to understand how any bargaining could occur if Broetje did not know the terms of the underlying lease. We have already addressed the factual questions presented as to Lynnwood's allegedly deceptive practices. In any event, it does not appear that there was any actual bargaining as to the provisions of the transfer agreement. Additionally, the lease itself is packed with creditor's remedies, including acceleration of pay-

ments in the event of default, liquidated damages, attorney's fees, late charges, forum selection, waiver of jury trial, waiver of hearing prior to repossession, appointment of attorney-in-fact for service of process, and waiver of relief from any appraisement, stay or exemption laws. It is also devoid of debtor's remedies. Defendants specifically challenge the commercial reasonableness of the liquidated damages clause [4] and the attorneys' fees [5] provision. The cumulative impact of these facts and allegations raises a question whether the terms are so one-sided as to be unconscionable.

## IV

■ Finally, defendants challenge the commercial reasonableness of the sale itself. Sale of collateral on default is controlled by the Uniform Commercial Code. *In re Zsa Zsa, Ltd.*, 352 F.Supp. 665, 669 (S.D.N.Y. 1972), *aff'd mem.*, 475 F.2d 1393 (2d Cir. 1973). Every aspect of the disposition, including the method, manner, time, place, and terms must be commercially reasonable. N.Y.U.C.C. § 9–504(3) (McKinney 1964); Wash.Rev.Code Ann. § 62A.9–504(3) (1966). The U.C.C. "imposes an obligation

4. Defendants question whether the 15% liquidated damages clause fairly and reasonably approximates the anticipated damages, or whether it is unenforceable as a penalty. Liquidated damages will be upheld if the liquidated amount "bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation. If, however, the amount fixed is plainly or grossly disproportionate to the probable loss, the provision calls for a penalty and will not be enforced." *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425–26, 393 N.Y.S.2d 365, 369, 361 N.E.2d 1015, 1018 (1977) (citations omitted). In *Leasing Service Corp. v. Justice*, 673 F.2d 70 at 73 (2d Cir. 1982), the Second Circuit upheld a similar liquidated damages clause in the absence of a purchase option.

Defendants call attention to the purchase option which, at the time of the making of the lease, set the lessee's purchase price for the equipment at $25,966 (7.6% of the lease price). Liquidated damages amounted to $51,047 (15%), so defendants allege that this amount was in reality a penalty since it exceeded the agreed upon residual value of the rig by $25,081—over 95%. That the option may have

lapsed is irrelevant since the agreement should be interpreted as of the date of its making and not as of the date of its breach. *Truck Rent-A-Center, Inc., supra*, 393 N.Y.S.2d at 369, 361 N.E.2d at 1018. Of course, liquidated damages may cover other costs above residual value. It might, for example, include the costs to LSC of dealing with the default (except attorney's fees which are separately provided for in the contract at 20%). Thus, there is a material question of fact as to the reasonableness of the 15% liquidated damages clause.

5. A question of fact also exists as to the provision for attorney's fees equalling 20% "of any amount sought" from the defendants. The "amount sought" includes the unpaid balance of $119,133 plus late charges remaining unpaid and 15% liquidated damages applied to the sale proceeds. This equals $133,825.79. Twenty percent of this amount is $26,765.16. Neither LSC, nor defendants have submitted any information which would shed light on the reasonableness of this figure as an estimate of the actual costs to LSC of legal representation in this case.

of good faith on the performance of every duty under the Code. . . . This means that the creditor must act to protect not only its interest, but the interest of the debtor as well." (Citation omitted.) *Connex Press, Inc. v. Intern. Airmotive, Inc.*, 436 F.Supp. 51, 56 (D.D.C.1977), *aff'd mem.*, 574 F.2d 636 (D.C.Cir.1978).

> Courts have often formulated the duty of a pledgee or mortgagee who sells collateral after default in terms of a fiduciary obligation. "Equity assigns to the pledgor and pledgee a trust relationship with resulting obligations on the pledgee. . . . One of those obligations (on the mortgagee and pledgee) is to 'use every effort to sell the [property] under every possible advantage of time, place and publicity.' ". . . The secured party's paramount obligation under article 9 is to act in a "commercially reasonable manner.". . . The secured party . . . is required to use his best efforts to sell the collateral for the highest price and to have a reasonable regard for the debtor's interests.

*Foster v. Knutson*, 84 Wash.2d 538, 548, 527 P.2d 1108, 1114 (1974).

While a low price is not conclusive proof that a sale has not been commercially reasonable, a large discrepancy between sales price and fair market value "signals a need for close scrutiny" of the sales procedures. *Connex Press, Inc. v. Intern. Airmotive, Inc.*, 436 F.Supp. at 56 (citing *In re Zsa Zsa Ltd.*, 352 F.Supp. 665, 671 (S.D.N.Y.1972)), *aff'd mem.*, 574 F.2d 636 (2d Cir. 1978). In *Connex Press, Inc.*, Judge Gesell analyzed the sale for $325,000 of a plane worth $700,-000.

> In fact, a single identically worded ad was placed in *The Wall Street Journal* and in *Trade-A-Plane*. Both publications had national distribution. The Wall Street Journal ad appeared as a public notice and not in the Aviation Section of its advertising, which is customarily used by the trade. The advertising expense was in fact minimal, amounting to $531.57. *The Wall Street Journal* ad was a column wide and 2¾ inches long. The *Trade-A-Plane* ad, also a column wide, was 2¼ inches long. Thirteen days

elapsed between the Wall Street Journal ad and the sale, and the *Trade-A-Plane* ad gave five days' notice. Both ads were written in matter-of-fact cautious terms that in no way encouraged buyer interest.

*Id.* at 55, *aff'd mem.*, 574 F.2d 636 (2d Cir. 1978). LSC claims that it advertised the sale in the Tri-City Herald of Pasco, Washington and the Contractors Hot Line for several days. The Tri-City Herald ads ran on four occasions beginning nine days prior to the sale. The Hot Line ads ran six times beginning twenty-one days before the sale. LSC paid $298.80 for advertising in both papers. Neither side, however, has submitted any information by which we may judge the reasonableness of this advertising. We have no information concerning the readership of the two papers, how large were the ads, or whether they were placed in parts of the papers likely to come to the attention of prospective bidders. In short, we cannot determine whether it would be reasonable to expect that persons desiring similar drilling rigs would see the ads.

We also find that material questions remain concerning the price at which the rig was sold. Defendants allege that the sale price, $50,000, was unreasonably low. Defendants aver that the rig was worth at least $120,000 based in part on the alleged statement of Graff, vice president of LSC's sister company, in a November 1981 telephone conversation with Broetje. Broetje Aff. ¶¶ 35–36. In *Credit Alliance Corp. v. Joshco Mining Corp.*, 80 Civ. 5547 (MEL) (1981), the fair market value of the item in question was $30,000–$35,000 and the sales price was $12,000 (roughly 35% of fair market value). Here, defendants contend that the market value of the rig was $120,000. The sale price was only $50,000, or 41.6% of alleged fair market value. Graff notes that different circumstances determine the price. Graff Reply Aff. ¶ 5. LSC has submitted data on auction prices of similar drill rigs of similar age to support its claim that the $50,000 bid-in price was commercially reasonable. These were auctions conducted by auctioneers while the sale LSC conducted was not. The only sale cited of a rig of

the same model year as the one in this case went for $70,000 at auction, and the three auctions conducted in August 1981 sold rigs for an average of $77,000. Thus, there are material questions as to the commercial reasonableness of the $50,000 sale price.

Finally, defendants question the fairness of an "auction" conducted without an auctioneer, attended only by LSC and its assignor, at which LSC was the only bidder.[6] Neither LSC nor the defendants has provided any information about the "bid-in" procedure and its comparability to normal auctions or sales.

### V

■ Having determined that the complaint states a claim, but that material factual issues remain to be decided which preclude summary judgment, we turn to defendants' motion for dismissal or transfer under 28 U.S.C. § 1404 (1976). Defendants urge that we set aside the forum selection clause and transfer the action to the Eastern District of Washington. Forum selection clauses are generally enforced unless the defendants can "show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Bense v. Interstate Battery System of America, Inc.*, 683 F.2d 718, 721 (2d Cir. 1982) (quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972)).

■ Neither the original lease, nor the transfer agreement, nor other communications with the defendants indicated that LSC is a New York corporation. Broetje never saw the original lease allegedly selecting New York as the forum for disputes and he claims to have been completely surprised that he had consented to it. On the other hand, LSC has an office in Portland, Oregon, about three hundred miles from Spokane, where the Eastern District of Washington sits. To the extent that defendants dealt directly with LSC, they did so through the Portland office. Lynnwood is headquartered in Lynnwood, Washington. All advertising and the sale of the equipment was done in and around Pasco, Washington. There was absolutely nothing about these transactions which could alert reasonable persons that disputes arising out of the agreements would be adjudicated 3,000 miles away in New York. Enforcement of the forum selection clause "would be unreasonable and unjust". *Id.*, at 721. We do not reach the issue of fraud and overreaching in obtaining the forum selection clause.

We must next decide the appropriate forum in which to try the case. The principal of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is otherwise authorized. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947). "[T]he open door may admit those who seek not simply justice but perhaps justice blended with some harassment." *Id.* at 507, 67 S.Ct. at 843. *Gulf Oil* directs us to consider such factors as the relative ease of access to sources of proof, the availability of compulsory process for attendance of unwilling witnesses, the cost of obtaining attendance of willing witnesses, and all other practical matters that would make trial easy, expeditious and inexpensive. *Id.* at 508, 67 S.Ct. at 843. There is also some value in having localized controversies decided locally and in a forum that is at home with the state law that

---

**6.** Defendants Richard and Betty Carman assert that notice was insufficient as to them since they received no notice of the sale. Supplemental Aff. of Richard and Betty Carman. "Service shall be made ... by delivering a copy of the ... complaint to him personally or by leaving copies thereof at his dwelling house or usual place of abode with some person ...". Fed.R.Civ.P. 4(d)(1).

LSC claims that Richard and Betty Carman refused to accept certified mail delivery of the notices and appends copies of the envelopes and postal receipts to substantiate their claim. Reply Aff. of LSC, Ex. 1 and 2. There is no dispute as to the material fact that LSC's notice was delivered to Richard and Betty Carman and that delivery was refused at the address which they indicated when signing the guarantee forms. Complaint, Ex. C-1. Thus their allegation as to insufficient notice of the sale of the equipment is without merit.

would likely govern the case. LSC opposes any transfer, citing the forum selection clause in the original lease. LSC argues that the forum selection provision of the lease should be enforced due to its incorporation by reference in the transfer agreement.

In addition to the factors already discussed regarding the forum selection clause, the negotiations leading to the original lease and the transfer agreement and the execution of those documents took place in Washington. The equipment was to be used and was used in Washington. The default occurred in Washington. The defendants are Washington residents, except Richard and Betty Carman who are Idaho residents and have stipulated to accept jurisdiction in Washington. All likely witnesses are residents of Washington or Oregon. Furthermore, the defendants allege that it would be an extreme hardship to leave Washington and travel 3,000 miles to defend the suit in New York City. We may assume that the records of these transactions and personnel familiar with them are in Portland. If LSC's records of this transaction are not there, they can surely be brought to Washington much more easily and inexpensively than flying all seven defendants and their witnesses and records to New York. Broetje states that he would have to leave his farm, that he has no staff who could replace him, and that he might not be able to compel the appearance of those witnesses who are not parties to this action. Broetje further claims that he has never been to New York, nor conducted any business here.

The balance of convenience and fairness in this case requires that we transfer the action to the Eastern District of Washington pursuant to 28 U.S.C. § 1404. Summary judgment is denied except as to the issue of notice of sale to Richard and Betty Carman.

SO ORDERED.