OPINION OF THE COURT
Norman H. Shilling, J.
In this holdover summary proceeding, landlord petitioner maintains that tenant respondents, by keeping a dog in their residential apartment, are committing a substantial breach of their lease which contains a provision prohibiting the harboring of animals on the premises without written consent of the landlord. The lease in question, a standard residential form lease, also contains a clause prohibiting waiver by the landlord of any provision therein, as well as a clause providing that no oral representations have been made by landlord or its agents, other than those contained within the four corners *121 of the form lease itself. Landlord relies on the afore-mentioned provisions in instituting summary proceedings to evict tenants from their apartment.
Tenants, for their answer, maintain as an affirmative defense to this proceeding, that the lease provision in question is unconscionable in that at the time the lease was executed they had had extensive discussions with landlord’s agents about their desire to obtain a dog to provide companionship for their small child who had recently lost a sibling through death; that the lease was signed at tenant’s kitchen table with the puppy in tenant’s lap and the landlord’s agent patting the dog on its head; that the agent stated at that time that tenants should disregard the no-pet provision of the lease and represented orally that landlord consented to the presence of the dog, having all apparent authority to do so. Although common instincts might dictate that such a clause be crossed out of the lease, the testimony adduced at trial is unrefuted that tenants are laymen, that they relied on agent’s representations at the time of execution of the lease, and that other tenants in the same building keep animals in their apartments regardless of standard form leases containing similar no-pet provisions. It is also a fact that at no time has landlord alleged that tenants’ particular dog has created a nuisance or danger on the premises.
Therefore, as a matter of law, this court finds that, pursuant to section 235-c of the Real Property Law, the lease provision in question is unconscionable under the circumstances existing at the time of execution of the lease, and that said clause will not be enforced against tenants in order to avoid an unconscionable result. Petition dismissed with prejudice.
Generally, the law regarding the harboring of animals in violation of a written lease provision is not settled; indeed, the courts are not in accord as to whether the mere fact that a tenant is keeping a dog on the premises is a violation of such magnitude as to constitute a breach of a substantial obligation of the terms of the tenancy (thus warranting eviction) in the absence of proof that the animal is an actual danger or nuisance to other residents or in the absence of a specific clause in the lease deeming such violation a substantial breach. " 'Substantial’ is a word of general reference which takes on color and precision from its total context. Having little if any meaning when considered in abstract or in vacuum, it must be defined with reference to the particular legal *122 and factual state in which it occurs.” (New York Life Ins. Co. v Dick, 71 Misc 2d 52, 61; Rasch, New York Landlord and Tenant, Summary Proceedings [2d ed], § 1063, and cases cited therein.)
There is no doubt, however, that in and of itself, a clause prohibiting the harboring of animals in residential premises is reasonable and enforceable. (Riverbay Corp. v Klinghoffer,34 AD2d 630; Pollack v Green Constr. Corp., 40 AD2d 996, affd 32 NY2d 720.) The court does not contest this holding, but finds that, under the specific factual circumstances of the instant case, the enforcement of such a lease provision would produce an unconscionable result.
The doctrine of unconscionability is relatively new to the law of landlord-tenant. Effective 1976, section 235-c of the Real Property Law, like the statutory warranty of habitability, attempts to place the tenant in legal parity with the landlord by recognizing that a residential lease is more akin to the purchase of shelter and services rather than the conveyance of a feudal estate, and that the law of sales, derived from contract principles, provides an analogy better suited than the outmoded law of property to determine the respective obligations of landlord and tenant. (Park West Mgt. Corp. v Mitchell, 47 NY2d 316, citing Green v Superior Ct., 10 Cal 3d 616, 626-627.)
Section 235-c of the Real Property Law is derived from section 2-302 of the Uniform Commercial Code (L 1962, ch 553, eff Sept. 27, 1964). The Uniform Commercial Code codified the doctrine, essentially equitable in nature, which was used by the common-law courts to invalidate contracts under certain conditions. An unconscionable contract was one "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.” (Earl of Chesterfield v Janssen, 2 Ves Sen 125, 155; 28 Eng Rep 82, 100 [1750]; cf. Hume v United States, 132 US 406.) A contractual clause would not be enforced where it was "so monstrous and extravagant that it would be a reproach to the administration of justice to countenance or uphold it.” (Greer v Tweed, 13 Abb Prac [NS] 427, 429.)
As codified under the Uniform Commercial Code, the term "unconscionability” is not defined, nor are the factors or elements thereof enumerated. The official comment under section 2-302 explains that "[t]he basic test is whether, in the light of the general commercial background and the commer *123 cial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. * * * The principle is one of the prevention of oppression and unfair surprise”. Commentators have elaborated on this broad explication to distinguish procedural unconscionability, wherein evidence of the contract-formation process must be scrutinized, and substantive unconscionability, wherein substantive elements of unconscionability must be identified in the content of the contract per se, either as an overall "elaborate lopsidedness” of the contract in its entirety, or as an example of "one-clause naughtiness”. (Leif, Unconscionability and the Code — The Emperor’s New Clause, 115 U of Pa L Rev 485, 512, 513; Murray, Unconscionability: Unconscionability, 31 U of Pitt L Rev 1.) Case law in this area has stressed various elements for determining the existence of unconscionability in a particular factual situation. High pressure sales tactics, failure to disclose terms of the contract, misrepresentation and fraud on the part of the seller (i.e., the party offering the contract, often on a take-it-or-leave-it basis; here, the landlord), refusal to bargain on certain crucial terms, clauses hidden in fine print and unequal bargaining power aggravated by the fact that the consumer, in many cases, cannot speak English, have been recognized as procedurally unconscionable. (Nu Dimension Figure Salons v Becerra, 73 Misc 2d 140; Brooklyn Union Gas Co. v Jimeniz, 82 Misc 2d 948.) Inflated prices, including grossly inadequate consideration given by the seller, unfair disclaimers of warranty and termination clauses have been deemed substantively unconscionable. (Industralease Automated & Scientific Equip. Corp. v R. M. E. Enterprises, 58 AD2d 482.) These examples are, by no mean, exhaustive. The concept of unconscionability must necessarily be applied flexibly depending on all the facts and circumstances of a given case. The weight given to each factor is as variable as the facts of each case. (Matter of Friedman, 64 AD2d 70.)
A consideration of case law and economic reason has led courts to extend the principles of section 2-302 of the Uniform Commercial Code to landlord-tenant situations. With the transformation of the housing market by rapid urbanization and population growth, and the growing trend toward characterizing a lease as a contract, the medieval concept of "Caveat lessee” is being eliminated. "[L]essees * * * are usually occa *124 sional customers, not acquainted with the carefully drafted legal terms set forth in such printed form leases. The landlord and his agents, assisted by expert legal counsel, carefully draft the lease in language designed solely for the landlord’s protection. When the landlord presents the lease to the lessee for acceptance and execution he is usually fully cognizant of the fact that the other party has not read or bargained for many of the incidental terms of the contract. The terms of the printed contract are usually nonnegotiable. In most cases the tenant is not represented by counsel. The landlord’s position is superior. He not only possesses superior knowledge, but offers a scarce commodity. * * * The landlord is a merchant in a sellers’ market place. * * * If one is a merchant, he has a special skill or particular knowledge; and for this reason he is held by the court to a completely different set of rules which are generally more strict than the rules that apply to nonmerchants. * * * A merchant is to be held to a higher standard of conduct by the court. * * * The lessee that has no choice but to sign an unconscionable lease agreement or not take the premises must be protected against the bad bargain he enters into. The lease in such cases is the equivalent of a consumer contract. The concept of laissez-faire, that is if the purchaser does not agree to lease of the seller he can go elsewhere, has no place in our enlightened society where lessor and lessee do not deal on equal terms and where lessee for all practical purposes does not have the option of shopping around for available renting accomodations of his choice.” (Seabrook v Commuter Housing Co., 72 Misc 2d 6, 7-8.)
The dominant belief of the laissez-faire system of late 18th and 19th century America was that parties were free to contract as they chose without interference by the courts, regardless of resulting harsh or oppressive terms. This almost sacred adherence to the concept of freedom of contract found its justification in the basic principle of contract law that one is bound by the writing one signs. Only recently has it been recognized that there can be no genuine assent where bargaining power is unequal and where often the only choice presented is "take-it-or-leave-it.” Today, the use of the form contract has become a necessary and economically advantageous component of the mass transaction. The code does not alter axiomatic contract principles but rather strengthens and transforms the outmoded concept of unrestrained freedom of contract to that of freedom of intended bargain. The doctrine *125 of unconscionability deals with the pathology of nonbargaining. "There is no freedom of contract in the equal treatment of unequals.” (Murray, p 28.) Underlying all contracts in such a system are the code’s basic obligations of good faith and fair dealing. (Uniform Commercial Code, §§ 1-203, 2-103.)
In the instant case, the landlord has clearly violated such obligations. Despite oral representations and assurances to the tenants at the time of execution of the lease that they may have a pet, landlord now chooses to invoke a written clause prohibiting animals without landlord’s written consent. Under circumstances such as these, the lease cannot be regarded as a sacrosanct document and landlord cannot be permitted to resort to the drastic remedy of eviction. Of crucial consideration is the fact that there have been no allegations that tenants’ particular dog is a nuisance or danger to others. There is no indication as to why landlord has waited several years to invoke this form clause and this court will not allow it to do so simply because it is there. As a matter of law, pursuant to section 235-c of the Real Property Law, the court finds the clause unconscionable and unenforceable. Petition dismissed with prejudice.