OPINION OF THE COURT
James C. Harberson, Jr., J.
The issue in this case is whether a tenant can terminate a lease to protect his family when a level three sex offender moves into the adjacent apartment.
Robert and Barbara Lax (landlords) had the tenants sign a six-page, 33-paragraph lease on August 1, 2006 for a one-year term. The terms of the lease, which the landlords obtained from an Internet site, were not negotiated by the parties before the landlords had the tenants sign it without any input or comment from the tenants.
The lease expressly provided a covenant of quiet enjoyment promising that the tenants “shall . . . peacefully and quietly . . . enjoy said premises for the term.” The lease also stated that in the event the tenants abandoned the premises before the term ended the landlord could “hold the tenant liable . . . for the rent that would have been payable . . . during the balance of the unexpired term.”
In January 2007, a level three sex offender moved in, with the tenants living next to the offender. On January 23, 2007 the tenants submitted a written request asking to be allowed to terminate the lease on January 31, 2007 because “it is our responsibility having three young girls that we feel are potentially endangered of any harm by said sex offender we feel it warrants a release to be granted.”
The tenants vacated the premises on January 31, 2007 without the landlords agreeing to terminate the lease on that date. When the tenants commenced this proceeding to recover the security deposit, the landlords counterclaimed for the balance of the rent due for the final six months of the contract which terminated on July 31, 2007.
It is quite clear that in New York it is the public policy of this state to protect potential victims of a sex offender from “the risk of a repeat offense by such sex offender and the threat posed to the public safety” (Correction Law § 168-Z [5]) by that sex offender in limiting where such offender may go or work *352 and requiring notification to the public via Internet postings and phone where this offender lives, as well as imposing an obligation to notify “vulnerable organizational entities” that deal with potential victims in general and children in particular (Correction Law § 168-Z [6]).
In New York as a matter of law a person who has been designated a sex offender under article 6-C of the Correction Law must appear before the court which is to “assess the risk of a repeat offense by such sex offender and the threat posed to the public safety” (Correction Law § 168-Z [5]). Once such an assessment is made the sex offender is required on a not less than annual basis to verify his or her address and to notify authorities otherwise whenever the address changes (Correction Law § 168-f). This information is made available along with other identifying information about the sex offender either by phone (Correction Law § 168-p) or by an Internet posting (Correction Law § 168-q) to the public.
Correction Law § 168-Z (6) (b) and (c) require
“law enforcement agencies [to] compile, maintain and update a listing of vulnerable organizational entities within its jurisdiction. Such listing shall be utilized for notification of such organizations in disseminating such information on level [two and three] sex offenders pursuant to th[ese] paragraph^]. Such listing shall include and not be limited to: superintendents of schools or chief school administrators, superintendents of parks, public and private libraries, public and private school bus transportation companies, day care centers, nursery schools, pre-schools, neighborhood watch groups, community centers, civic associations, nursing homes, victim’s advocacy groups and places of worship.”
Penal Law § 65.10 (4-a) makes it a mandatory condition for some sex offenders not to enter onto “school grounds” and Correction Law § 168-v prohibits a registered sex offender from “operating], be[ing] employed on or dispensing] goods for sale at retail on a motor vehicle engaged in retail sales of frozen desserts.” These specific prohibitions are in addition to those included as part of any terms and conditions of probation and/or parole release as well as those various local laws enacted by various municipalities in the state which prohibit a sex offender from venturing within a designated distance from areas where children might be found, i.e., playgrounds, pools, schools.
*353 The law, then, in addition to limiting where a sex offender can go, relies upon providing a warning system to alert members of the public about where these offenders are and where they live so steps can be taken to protect one’s self or family or others by being on guard against becoming a victim of a “repeat offense by such sex offender.”
What strikes the court is the emphasis in the notification requirements and the other laws on keeping a sex offender away from the vicinity of children. This reflects the universal concern of society and any parent of a child when a sex offender is found in the proximity of where that child is located.
A reasonable parent or caretaker of a child will either institute heightened vigilance and/or remove the child physically from the zone of danger around the sex offender to reduce the risk to the child of becoming a victim of the sex offender repeating a sexual offense against the child. It is clear that isolating a child from the sex offender puts enormous pressure on a parent to remove the child from the location where the sex offender is located as being the first line of defense to keep the child from becoming a victim of a sex attack.
In this case, where a level three sex offender took up residence in an apartment adjacent to where the tenants with three young daughters lived and there was no means to protect them from being victims of a potential repeat offense by this level three sex offender except to remove them from the threat by vacating the apartment and moving away, the court agrees that the tenants had valid grounds to request an early termination of the lease.
The court finds that the alternative choice to remain in the apartment until the end of the term six months later and exercise a constant vigilance to protect the children would place unreasonable pressure on the tenants and would completely destroy the peaceful and quiet enjoyment of the apartment expressly covenanted by the lease.
Decision
The lease adopted by the landlords provided that it shall “be governed, construed and interpreted by . . . the laws of New York.” A review of this agreement under New York law is helpful in deciding this case.
In Rowe v Great Atl. & Pac. Tea Co. (46 NY2d 62 [1978]), the Court in dealing with a dispute over a lease contract discussed how “society has chosen to intervene in various ways in the *354 dealings between private parties . . . best exemplified by statutes mandating the express or implicit inclusion of certain . . . provisions in various types of contracts,” such as are found in article 7 of the Real Property Law at sections 227, 234, 235-b, 235-c and 235-f {id. at 68).
The Court went on to say such interventions are “also illustrated by judicial decisions to the effect that there exists in every contract certain implied-by-law covenants, such as the promise to act with good faith,” and, “[i]n a similar vein, the law has developed the concept of unconscionability so as to prevent unjust enforcement of onerous contractual terms which one party is able to impose [on] the other because of a significant disparity in bargaining power (e.g., Uniform Commercial Code, § 2-302)” {id.).
In 511 W. 232nd Owners Corp. v Jennifer Realty Co. (98 NY2d 144 [2002]), the Court said that the “duties of good faith and fair dealing . . . encompass ‘any promises which a reasonable person in the position of the promisee would be justified in understanding were included’ ” (id. at 153, quoting Rowe, 46 NY2d at 69).
Warranty of Habitability
Real Property Law § 235-b (1) states that “[i]n every written . . . lease . . . the landlord . . . shall be deemed to covenant and warrant that the . . . occupants of such premises shall not be subjected to any conditions which would be dangerous ... or detrimental to their life, health or safety.”
In Park W. Mgt. Corp. v Mitchell (47 NY2d 316 [1979]), the Court stated that “[t]hreats to the health and safety of the tenant . . . determines the reach of the warranty of habitability” (id. at 328).
In Raghu v 24 Realty Co. (7 AD3d 455 [2004]), the Court said that “[fit is well established that a landlord has a ‘common-law duty to take minimal precautions to protect tenants from foreseeable harm,’ which duty encompasses a third party’s foreseeable criminal conduct” (id. at 456; see, Nallan v Helmsley-Spear, Inc., 50 NY2d 507 [1980]; James v Jamie Towers Hous. Co., 99 NY2d 639 [2003]; Jacqueline S. v City of New York, 81 NY2d 288 [1993]).
The Court in Matter of Nostrand Gardens Co-Op v Howard (221 AD2d 637 [1995]) found that a failure of a landlord “to take any effective steps to abate” a problem (noise) caused by another tenant breached “the warranty of habitability by *355 depriving the [tenants] of the quiet enjoyment of their apartment” (id. at 638).
In this case, assuming the natural and reasonable concerns expressed by the tenants for the welfare of their family due to having a level three sex offender move into the neighboring apartment was a “safety threat” that fell within “the reach of the warranty of habitability” (Park W., 47 NY2d at 328), then the landlords’ duty — “which . . . encompasses a third party’s foreseeable criminal conduct” (Raghu, 7 AD3d at 456) — would be to force the sex offender to move elsewhere, but only if they “could have taken [such a] step[ ]” (Cohen v Werner, 82 Misc 2d 295, 298 [1975]).
However, Real Property Law § 235-f prohibits a landlord from removing a registered sex offender either as a guest or occupant of a tenant’s leasehold as has occurred in this case based solely on that designation — unless perhaps his right “to restrict occupancy in order to comply with federal, state or local laws, regulations, ordinances or codes” (Real Property Law § 235-f [8]) could be construed to apply if the leasehold was located within an area which excluded sex offenders.
The court finds that Real Property Law § 235-b does not impose a duty on a landlord to remove a registered sex offender who has become a legal occupant of his rental property merely due to that designation.
Real Property Law § 235-c (1): Unconscionability
Real Property Law § 235-c (1) states:
“If the court as a matter of law finds a lease or any clause of the lease to have been unconscionable at the time it was made the court may refuse to enforce the lease, or it may enforce the remainder of the lease without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.”
In Matter of State of New York v Auco Fin. Serv. of N.Y. (50 NY2d 383 [1980]), the Court related that “[a]s a general proposition, unconscionability, a flexible doctrine . . . , requires some showing of ‘an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party’ (Williams v Walker-Thomas Furniture Co., 350 F2d 445, 449)” (id. at 389). In Williams the court said,
“Ordinarily, one who signs an agreement without *356 full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms. In such a case the usual rule that the terms of the agreement are not to be questioned should be abandoned and the court should consider whether the terms of the contract are so unfair that enforcement should be withheld.” (350 F2d at 449-450).
In Matter of Friedman (64 AD2d 70 [1978]), the Court stated that “[t]he concept of unconscionability must necessarily be applied in a flexible manner depending upon all the facts and circumstances of a particular case” {id. at 85). The Court went on to explain that “[s]ubstantive elements of unconscionability appear in the content of the contract per se; procedural elements must be identified by resort to evidence of the contract formation process” {id.).
In Matter of State of New York v Bel Fior Hotel (74 AD2d 692 [1980]), the dissent, citing Friedman, addressed a lease entered into by tenants “confronted with a lack of meaningful choice, resulting in inequality in bargaining power” and the fact that “the terms of the damage deposit provision unreasonably favor[ed]” the landlord {id. at 693 [Greenblott, J., dissenting]; see, Avildsen v Prystay, 171 AD2d 13 [1991]).
In Jones v Star Credit Corp. (59 Misc 2d 189 [1969]), the court observed that “the meaningfulness of choice essential to the making of a contract can be negated by a gross inequality of bargaining power. (Williams v. Walker-Thomas Furniture Co., 350 F. 2d 455.)” (Id. at 192.) In Carnival Cruise Lines, Inc. v Shute (499 US 585 [1991]), the dissent said, “The common law . . . subjects terms in contracts of adhesion to scrutiny for reasonableness” (id. at 600 [Stevens, J., dissenting]).
In Seabrook v Commuter Hous. Co. (72 Misc 2d 6 [1972], affd 79 Misc 2d 168 [1973]), the court’s discussion of leases, the relationship of landlords and tenants in entering into one and the doctrine of unconscionability in general, defined at UCC 2-302, as being applicable to lease contracts created a guide thereafter followed by many decisions which provided relief to tenants from unconscionable leases or terms therein.
*357 The Seabrook court stated that
“lessees . . . are usually occasional customers, not acquainted with the carefully drafted legal terms set forth in . . . printed form leases . . . carefully draft [ed] ... in language designed solely for the landlord’s protection. When the landlord presents the lease to the lessee for acceptance . . . he is usually . . . cognizant of the fact that the other party has not read or bargained for many of the incidental terms of the contract [as] . . . terms of the printed contract are usually nonnegotiable” (72 Misc 2d at 7).
The court goes on to conclude that a “lessee that has no choice but to sign an unconsionable lease agreement . . . must be protected against the bad bargain he enters into” because “laissez-faire . . . has no place in our enlightened society where lessor and lessee do not deal on equal terms” (id. at 8), especially when rental housing being in short supply limits the ability of a tenant to seek better lease deals.
The court after reviewing the terms of the lease said that “[i]n Williams v. Walker-Thomas Furniture Co. (350 F. 2d 445) the court found that unequal bargaining powers and the absence of a meaningful choice on the part of one of the parties, together with contract terms which unreasonably favor the other party, may spell out unconscionability” (id. at 11).
In Edgemont Assoc. v Skolnick (90 Misc 2d 761, 763 [1977]), the court reviewed the then-recent enactment of Real Property Law § 235-c, noting that “[t]he Governor’s Message of Approval of this new section specifically engrafts the spirit of section 2-302 of the Uniform Commercial Code, striking down unconscionable commercial contracts, into landlord tenant relationships,” and included a specific reference to Seabrook.
The court finds that the lease contract of some 33 terms preprinted and submitted to the tenants without discussion and with no opportunity given the tenants to participate in the wording of the contract terms was an adhesion contract.
In an adhesion contract, the terms of such are subject “to scrutiny for reasonableness” (Carnival Cruise Lines, 499 US at 600 [Stevens, J., dissenting]) as to whether there was “an absence of meaningful choice on the part of [the tenant] together with contract terms which are unreasonably favorable to the [landlord]” (Avco Fin. Serv. of N.Y., 50 NY2d at 389).
In applying the “concept of unconscionability ... in a flexible manner [based] upon all the facts and circumstances of a *358 particular case” (Matter of Friedman, 64 AD2d at 85), the court finds both substantive and procedural elements of unconscionability are present in the formation and terms of this contract. (See, Nu Dimensions Figure Salons v Becerra, 73 Misc 2d 140, 143 [1973].)
The court finds that as the tenants had no input in making the terms of the preprinted contract presented to them to sign by the landlords, the tenants were “confronted with a lack of meaningful choice, resulting in inequality in bargaining power” (Bel Fior Hotel, 74 AD2d at 693 [Greenblott, J., dissenting]), so the tenants’ “meaningfulness of choice essential to the making of [the lease agreement was] negated by [this] . . . inequality of bargaining power” (Jones, 59 Misc 2d at 192).
The court also finds that
“when a party of little bargaining power, and hence little real choice, signs [an] . . . unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms. . . . [T]he court should consider whether the terms . . . are so unfair that enforcement should be withheld” (Williams, 350 F2d at 449-450).
The court concludes that the “abandonment” clause in the contract, which gives the landlords various options, including continuing to charge the tenants the full rent due for the balance of the term if the tenants quit the leasehold before the end of the one-year term, without regard to the reason the tenants abandon the premises, even for good cause, was “unconscionable” under Real Property Law § 235-c (1) for that reason when it was made.
In this case, when the tenants advised the landlords they had to quit the apartment due to the risk posed by a level three sex offender moving into the adjacent apartment to the safety of their three young daughters and the landlords refused to terminate the lease for that reason and sought, under the “abandonment” clause, all the rent due for the balance of the term, the court finds this is an example of when to apply, under Real Property Law § 235-c, “the concept of unconscionability ... to prevent the unjust enforcement of onerous contractual terms which one party is able to impose [on] the other because of a significant disparity in bargaining power” (Rowe, 46 NY2d at 68).
*359 Good Faith and Fair Dealing
In Market St. Assoc. Ltd. Partnership v Frey (941 F2d 588 [1991]), Judge Posner, in discussing contract law remedies, observed, “The concept of the duty of good faith ... is a stab at approximating the terms the parties would have negotiated had they foreseen the circumstances that have given rise to their dispute” (id. at 595).
He goes on to say that contracts
“set in motion a cooperative enterprise, which may to some extent place one party at the other’s mercy. ‘The parties to a contract are embarked on a cooperative venture, and a minimum of cooperativeness in the event unforeseen problems arise at the performance stage is required even if not an explicit duty of the contract.’ ” (Id.)
He points out,
“The . . . doctrine of good faith is to forbid the kinds of opportunistic behavior that a mutually dependent, cooperative relationship might enable in the absence of rule. ‘ “Good faith” is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.’ ” (Id.).
Judge Posner explains that
“[a]t the formation of the contract the parties are dealing in present realities; performance still lies in the future. As performance unfolds, circumstances change, often unforeseeably; the explicit terms of the contract become progressively less apt to the governance of the parties’ relationship; and the role of implied conditions — and with it the scope and bite of the good-faith doctrine — grows” (id. at 595-596).
In Dalton v Educational Testing Serv. (87 NY2d 384 [1995]), the Court observed that
“[implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance (see, Van Valkenburgh, Nooger & Neville v Hayden Publ. Co., 30 NY2d 34, 45, cert denied 409 US 875).
“Encompassed within the implied obligation of each *360 promisor to exercise good faith are ‘ “any promises which a reasonable person in the position of the promisee would be justified in understanding were included” ’ (Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 69, quoting 5 Williston, Contracts § 1293, at 3682 [rev ed 1937]). This embraces a pledge that ‘neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract’ (Kirke La Shelle Co. v Armstrong Co., 263 NY 79, 87)”(id. at 389).
The lease contract prepared by the landlords is a 33-paragraph “New York Lease Agreement” copied from an Internet site. It was presented to the tenants to sign without any input from them as to its terms.
The express covenant of quiet enjoyment (para 18) promises that the tenants “shall and may peacefully have, hold and enjoy said premises for the term.” Paragraph 22 of the agreement, entitled “Abandonment,” gives the landlords in the event the tenants quit the leasehold to, among other things, “hold the tenant[s] liable for any difference between the rent that would have been payable under this Agreement during the balance of the term.”
The tenants quit the premises in this case because when the level three sex offender moved into the next apartment, due to the consternation arising from the concern they had for their three small daughters, they no longer felt they enjoyed the promise that they “may peacefully . . . enjoy said premises for the [balance of] the term” as stated in the lease.
It is clear that neither the landlords nor the tenants at the time the lease was signed contemplated a level three sex offender moving into part of the dwelling rented to other tenants, so when this happened and the tenants brought their concerns to the landlords, the court finds this was a legitimate example of a case where the “implied-by-law covenant[ ] . . . to act with good faith” (Rowe, 46 NY2d at 68) would apply to the landlords.
When the parties entered into this lease agreement they were dealing with “present realities” (Market St. Assoc., 941 F2d at 595) at the time it was signed, which did not include the presence of a level three sex offender living in the next apartment. The “circumstances” changed “unforeseeably” and the “explicit terms of the contract [became] progressively less apt to the governance of the parties’ relationship; and the role of implied *361 conditions — and with it the scope and bite of the good-faith doctrine — [grew]” (id. at 595-596).
In this case, where the tenants told the landlords they had to quit the lease months before the term ended due to the circumstances, Judge Posner’s observation is apt: “[T]he concept of the duty of good faith . . . is a stab at approximating the terms the parties would have negotiated had they foreseen the circumstances that have given rise to the dispute” (id. at 595).
The court finds in this case “a reasonable person in the position of the promisee [tenants] would be justified in understanding” (Rowe, 46 NY2d at 69) that the landlords would allow them to terminate the lease in the event a level three sex offender moved into the next-door apartment because neither they nor the landlords would have expected any objection to such an early termination in such an event when the landlords could not force the level three sex offender to vacate the apartment for the safety of the tenants’ family.
In this case, the court concludes that the landlords’ refusal to allow the tenants to terminate the contract six months before the expiration date, followed by their request under the “abandonment” clause for an additional six months’ rent of $2,700, after it was evident that the tenants’ right to quiet enjoyment of the apartment was shattered by the level three sex offender moving in next door, was a violation of the covenant of good faith implied in the lease agreement to deal with a situation at the time it was signed.
To quote Judge Posner in Market St. Assoc. Ltd. Partnership, as the
“doctrine of good faith is to forbid . . . opportunistic behavior ... in the absence of rule . . . [there is an] ‘implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.’ ” (Id. at 595.)
The court finds that this is exactly what the landlords did by refusing to in good faith release the tenants from the obligation to pay the balance due on the lease agreement and not agreeing to an earlier termination of the agreement under these unusual circumstances; the landlords took “opportunistic advantage” of the tenants’ being forced out of the place due to the level three sex offender moving into the next apartment.
The landlords also expressly warranted to the tenants peaceful and quiet enjoyment of the leasehold which they could no *362 longer provide when a level three sex offender moved into the adjoining apartment. Since they could not remove this sex offender under Real Property Law § 235-f so as to restore to the tenants quiet enjoyment of the leasehold, they should have allowed the tenants to vacate the apartment without further rent obligations so they could afford to move their family to safer surroundings.
The court finds that this resolution approximates “the terms the parties would have negotiated had they foreseen the circumstances that [gave] rise to their dispute” (Market St. Assoc. Ltd. Partnership, 941 F2d at 595), a “promise[ ] which a reasonable person in the position of the [tenants] would be justified in understanding [was] included” (Rowe, 46 NY2d at 69) that the tenants could terminate the lease and leave the apartment when they could no longer continue to live next to a level three sex offender due to the risk to their children. For the landlords to refuse to allow an early termination of this lease and to insist on full payment of the rent due until the end of the original term six months later would be a violation of the covenant of good faith and fair dealing implicit in all New York contracts based on the facts of this case.
Conclusion
The court has ruled that under Real Property Law § 235-c (1) the “abandonment” clause of this lease was unconscionable at the time the agreement was signed, and has refused to enforce it based on the circumstances of this case. In addition, the landlords violated the covenant of good faith and fair dealing when they refused to cooperate when the unforeseen circumstance of a level three sex offender moving into the adjacent apartment required the tenants to request an early termination of the agreement for that reason to protect their children.
In support of this conclusion by the court, it is noted that as observed in Rowe the Legislature had passed statutes “mandating the express or implicit inclusion of certain . . . provisions” in the lease contract (46 NY2d at 68); the Legislature has again mandated the same relief allowed by this court in a situation where a tenant is the victim of violence.
Real Property Law § 227-c (as added by L 2007, ch 73, eff Aug. 3, 2007) allows a victim of abuse for whom an order of protection has been issued to terminate a residential lease without incurring any further liability for future rent further eroding the concept of “[c]aveat lessee” (Hollywood Leasing *363 Corp. v Rosenblum, 100 Misc 2d 120,123 [1979]; Frazier v Priest, 141 Misc 2d 775, 780 [1988]).
In his approval message, Governor Eliot Spitzer wrote:
“This bill authorizes a domestic violence victim who has an order of protection against a batterer to seek a further order, which would permit the victim to terminate a residential lease without penalty. The sponsors of the bill note that many domestic violence victims would be safer if they could move to a location where their abuser cannot find them, but the victims lack the financial resources to move because they often have ongoing lease obligations.
“Although allowing individuals to break their contractual obligations should occur only rarely, it is appropriate where, as here, it would substantially increase the safety of a vulnerable population. Moreover, this bill contains significant protections to ensure that leases are terminated only when absolutely necessary” (Governor’s Mem approving L 2007, ch 73 [filed with 2007 NY Assembly Bill A3386).
Real Property Law § 227-c states that one of the criteria for allowing relief where “there . . . exist[s] a substantial risk of physical or emotional harm to such person or such person’s child ... if the parties remain in the premises and that relocation will substantially reduce such risk” (Real Property Law § 227-c [2] [b] [i]). This legislation should be expanded to allow similar rights to a tenant endangered when a registered sex offender moves into the same building, i.e., to allow a tenant to relocate to avoid similar risks. “The day of caveat emptor, caveat lessee and . . . Simon Legrees are over as a matter of law for the tenants of this State” (Frazier, 141 Misc 2d at 780).
In light of the fact that there are currently 280 registered sex offenders living in Jefferson County, of which 147 live in the City of Watertown and 3 in Antwerp, this case deals with a developing issue that has not only local but statewide implications. This is caused by the relentless drive to identify registered sex offenders and circumscribe their movements in an effort to keep them away from vulnerable members of society due to their predetermined risk of reoffending, and the rights of parties in a lease contract when a registered sex offender becomes a resident of the same building.
This decision will allow a tenant the right to terminate a lease in such case in order to allow the tenant to move to a safe *364 location without liability for future rent. This conclusion is based on the fact that if state law prohibits a registered sex offender from selling ice cream to children from a truck, then a tenant should have a right to remove his children from a living unit when a sex offender resides next door in order to also keep a sex offender away from his children.
The plaintiffs are awarded $150 as a partial refund of the $450 security deposit after allowing defendant $300 credit for the balance due on the January 2007 rent together with costs of $15. The defendant’s counterclaim for $2,700 in rent due under the lease agreement for the period from February 2007 until July 2007 is denied.