### In re Shelley Palmer

[769 A.2d 623]

No. 00-234

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed December 22, 2000

*Paul S. Gillies* of *Tarrant, Marks & Gillies*, Montpelier, and *John Thrasher*, South Royalton, for Appellant.

*William H. Sorrell*, Attorney General, and *Phillips B. Keller III*, Special Assistant Attorney General, Montpelier, for Appellee.

**Skoglund, J.** Bail bondsman Shelley Palmer appeals from the decision of the Commissioner of the Department of Banking, Insurance, Securities and Health Care Administration revoking his insurance agent's license and fining him $10,000 for engaging in a pattern of financially irresponsible, dishonest, and untrustworthy conduct. We affirm.

Palmer does not dispute the findings made by the Department's hearing officer and adopted by the Commissioner, which reveal the following. Palmer is a bail bondsman who was first issued an insurance agent's license by the Department in August 1992. After obtaining his license, Palmer became the president, vice-president,

and corporate treasurer of his business, Green Mountain Bail Bonds, Inc. From 1992 to 1999, Palmer was a bail bond agent for the International Fidelity Insurance Company, a New Jersey corporation licensed to transact surety insurance in Vermont. Under the producer's contract entered into by Palmer and Fidelity, Palmer was required, among other things, (1) to observe all of the Department's rules and regulations; (2) to adhere to Fidelity's filed premium rate, which was ten percent of the face amount of any bail bond that he wrote; (3) to take collateral as security for bail obligations only in his capacity as a trustee for Fidelity; (4) to take a mortgage as collateral only in the name of Fidelity; and (5) to use Fidelity's standard bail bond application form when writing new business. With respect to collateral given to secure a client's bail obligations, the terms of Fidelity's application form permitted the company to use the collateral to recoup losses or expenses resulting from a breach of the bond, but did not allow the company to retain any excess proceeds after being reimbursed in full.

Initially, Palmer complied with the terms of the producer's contract, but beginning in 1996 he began engaging in practices that were contrary to his obligations to Fidelity under the agreement. For example, beginning in 1996, Palmer began taking mortgage deeds as collateral in the name of his business rather than in Fidelity's name. Further, Palmer never informed Fidelity of his decision to do so. Nor did Palmer inform Fidelity or the Department of his decision to deviate from his contractual obligation to adhere to Fidelity's filed premium rates. Palmer also deviated from Fidelity's approved premium rate by allowing clients to pay for bail bonds with personal property that was worth more than the cash premium he could have lawfully charged, and by retaining surplus from the sale of that property. In 1999, Fidelity dropped Palmer as an agent because of his failure to acknowledge that he was engaging in commercially unreasonable business practices.

Palmer's unreasonable and unethical practices eventually came to the attention of the Department. The instant disciplinary proceeding stemmed primarily from Palmer's dealings with two clients. The first client, M.M., was jailed on April 4, 1997 on a burglary charge after he was unable to make bail, which had been set at $1000. When contacted by M.M., Palmer stated that he would charge $200 for the bond, and that M.M. could pay the premium within two weeks if he executed a promissory note and provided collateral to secure both the premium and the principal amount of the bail bond. After learning that M.M.

had recently purchased a house for $28,500 from insurance settlement funds, Palmer agreed to accept the house as collateral. The next day, Palmer brought eleven pages of documents to the correctional center for M.M. to sign. The documents, which had been prepared by Palmer and his attorney, included a promissory note in the amount of $200, a mortgage deed and quitclaim deed to M.M.'s house in the name of Green Mountain Bail Bonds, and a Fidelity bail bond application form containing amendments added by Palmer. The amendments provided that M.M.'s failure to pay the $200 premium on time or to comply with the terms of the bail agreement would result in unconditional forfeiture of his house to Green Mountain Bail Bonds. Coupled with the quitclaim deed, the amendments allowed Palmer to take immediate title and possession of M.M.'s property without resort to a judicial foreclosure proceeding and further imposed no requirement on Palmer to sell the property at a foreclosure sale or to return the surplus proceeds to M.M.

M.M. was neither highly educated nor sophisticated in business matters. He did not understand the papers Palmer presented to him, and, in particular, did not understand that his failure to pay $200 would result in the unconditional forfeiture of his home. Notwithstanding his inability to understand the documents, he signed them to get out of jail. He told Palmer that he planned to leave for Massachusetts immediately upon his release to attend court hearings pending in that state and to visit his family. On his bond application, he provided Palmer with the names, addresses, and telephone numbers of his family members in the Boston area so that Palmer could contact him if necessary. Palmer told M.M. not to worry about paying the $200 premium immediately because Palmer had the house as collateral.

Because M.M. had received a notice from the district court clerk that his next scheduled court appearance would be a May 13, 1997 calendar call, M.M. left for Massachusetts under the assumption that he would not need to return to Vermont until then. He failed to leave a Massachusetts forwarding address with the court, however, and thus did not receive a subsequent notice of a procedural conference in his burglary case set for April 15, 1997 to establish whether he had legal representation. When M.M. failed to appear for that hearing, the court issued a warrant for his arrest and set an additional bail of $200, but did not initiate proceedings to forfeit M.M.'s bail, as it could have done.

On April 22, 1997, three days after the due date in the bail agreement had passed without M.M. paying Palmer the $200 he owed

him, Palmer took the unusual step of asking the district court to set a hearing for forfeiture of M.M.'s bail. Palmer did so because he believed that a forfeiture order would strengthen his claim that M.M. had breached the bail agreement and thus forfeited his right to his home. Within the next few days, Palmer filed in the town land records the quitclaim deed transferring ownership of the house to his business. He then took possession of the house, removed M.M.'s possessions, and changed the locks. When M.M. returned on May 12, the day before his scheduled calendar call, he telephoned Palmer and told him that he had been unaware of the April 15 conference. Palmer then called the state police, who arrested M.M. on the outstanding warrant.

The following morning, the district court offered to continue M.M.'s bail forfeiture hearing until later that afternoon so that M.M., who was due to be transported from jail for a calendar call appearance, could be present. Palmer stated that he did not want to postpone the hearing. He also told the court that he could not explain M.M.'s nonappearance for the April 15 hearing and that he had made every reasonable effort to contact M.M. but was unable to do so. Palmer made these statements to the court even though he had made no effort to contact M.M. through the Massachusetts numbers M.M. had left with him, and M.M. had only a day earlier explained to Palmer why he had missed the hearing. Nonetheless, Palmer made these misrepresentations for the sole purpose of convincing the court to forfeit bail so that he could enhance his claim on M.M.'s house. Eventually, Palmer sold M.M.'s home furnishings and transferred ownership of the home to him and his wife to use as collateral for a loan to pay off home improvements on his personal residence, office equipment, and legal expenses.

The other major incident that led to the instant disciplinary proceeding involved D.A., who asked Palmer on May 30, 1998 to post a $25,000 bail bond to secure his release from prison. D.A. assented to Palmer's request that he execute a promissory note agreeing to pay the $2500 premium by June 1, 1998. To secure D.A.'s payment of the premium, Palmer required D.A. to provide his 1997 pickup truck as collateral. Palmer added an amendment to the bond application form providing that he could sell the truck without notice and retain any surplus if D.A. defaulted on his payments under the promissory note. As was the case with the corresponding amendment in M.M.'s bail application, the language allowing Palmer to sell the truck and retain any surplus was inconsistent with the language of the promissory

note, which provided that a failure to make timely premium payments would result in an assessment of interest and delinquency fees, but did not state that D.A. would forfeit his truck.

·D.A. failed to pay the $2500 on June 1, and the next day Palmer sent him an invoice demanding that he pay the overdue premium as well as a five percent late fee that was not yet due under the terms of the contract. On June 6 or 7, Palmer received a certified check for $2500 from D.A., but he returned it without cashing it. On June 9, at Palmer's request, the district court discharged the bail bond that he had posted for D.A., thus ending Palmer's financial liability in the case. Three days later, Palmer sold D.A.'s truck at auction, netting $17,650. Palmer kept the entire amount and sent D.A. an invoice stating that the premium had been paid in full. After D.A. complained to the Department, Palmer and D.A. entered into a private settlement agreement under which Palmer agreed to pay D.A. $28,000 in return for a release from liability.

In addition to the two transactions described above, the hearing officer cited another incident, in which Palmer was convicted of simple assault. The victim of the assault, R.G., had agreed to act as a guarantor on two bail bonds Palmer posted for R.G.'s nephew. R.G. went to Palmer's home to give Palmer paperwork that he hoped would allow Palmer to release him from financial liability on his nephew's bonds. R.G. identified himself when he arrived at Palmer's home, and Palmer asked him to come in. When R.G. entered Palmer's residence, Palmer pointed a semiautomatic pistol at him. Palmer was convicted of attempting, by physical menace, to place another in fear of imminent serious bodily injury. See 13 V.S.A. § 1023(a)(3). We affirmed that conviction. *State v. Palmer*, 169 Vt. 639, 740 A.2d 356 (1999).

Based on the above incidents and defendant's pattern of misconduct over the years, the hearing officer concluded, following fourteen days of testimony, that Palmer had engaged in financially irresponsible conduct and untrustworthy behavior, in violation of 8 V.S.A. § 4804(a)(9), which provides that the Commissioner may suspend or revoke any license issued under the subchapter if "the licensee has used fraudulent, coercive, or dishonest practices, or has shown himself to be incompetent, untrustworthy or financially irresponsible." The hearing officer also concluded that Palmer (1) violated 8 V.S.A. § 4804(a)(5) by improperly retaining surplus proceeds from the sale of D.A.'s truck; (2) violated 8 V.S.A. § 7008(a) by requiring M.M. and D.A. to sign documents containing disguised delinquency

fees in excess of the maximum allowable penalty; and (3) engaged in unfair trade practices, in violation of 8 V.S.A. § 4724(12), (13), (15), and (19), by failing to promptly return surplus proceeds from the sale of D.A.'s truck, by assessing an unfiled and unapproved premium rate, and by using bail agreements that contained conflicting language regarding his rights to the client's collateral in the event of a default.

The hearing officer recommended that Palmer's license be revoked and that he be required to pay an administrative penalty of $10,000. The Commissioner adopted the hearing officer's findings and conclusions, ruling that the egregious nature of Palmer's conduct, coupled with his continued denial of any wrongdoing, warranted the assessment of a $10,000 administrative penalty and the revocation of his insurance agent's license to protect the public.

On appeal, Palmer disputes the Department's expertise in regulating the business of bail and argues that the Department has no authority or jurisdiction to discipline him for the offenses alleged in this action. We find no merit to this argument. A commercial bail bond is a three-way contract between a surety company, a criminal defendant, and a court under which the surety company posts a bond with the court to secure the defendant's release from custody on bail. In Vermont, as in most states, commercial bail bonds are considered to be insurance products, and thus agents who post bail bonds on behalf of surety companies are licensed and regulated as insurance agents by the state insurance department and are subject to the state's unfair trade practices law.

Vermont law allows corporations to offer "surety insurance," which includes "guaranteeing and executing bonds." 8 V.S.A. § 3301(a)(8)(C); see *State v. Vendrell*, 484 A.2d 720, 722 (N.J. Super. Ct. App. Div. 1984) (bail bond "constitutes a surety agreement governed by the same legal principles applicable to the construction and consequences of surety agreements in general"). Surety agents are subject to the licensing provisions contained in our insurance law. See 8 V.S.A. § 4793(b)(1)(D) (insurance agent may receive qualification for a license in various fields, including "surety" insurance). Moreover, the chapter of our insurance law dealing with unfair trade practices defines "insurance contract" to include a "contract of . . . suretyship." 8 V.S.A. § 4722(3). Further evidence of the Legislature's intent to have the Department regulate bail bond agents is contained in 13 V.S.A. § 7554a, which provides that the court administrator may approve any agent to act as a surety to execute a bond or post

bail as long as the agent "is licensed under the provisions of chapter 131 of Title 8" and the administrator has consulted with "the commissioner of banking, insurance, securities, and health care administration." These statutes establish the Department's authority to license Palmer and govern his conduct in his capacity as a surety agent who posts bail.

■ These statutes also demonstrate, notwithstanding Palmer's claim to the contrary, that bail agreements are within the Department's expertise; thus, the Department's decisions in this area are entitled to deference on review to this Court. See *In re Professional Nurses Serv., Inc.*, 164 Vt. 529, 532, 671 A.2d 1289, 1291 (1996) (absent clear and convincing showing to contrary, decisions involving agency's interpretation of statutes within its particular area of expertise are presumed correct, valid, and reasonable); *In re Diel*, 158 Vt. 549, 551, 614 A.2d 1223, 1225 (1992) (administrative agency's conclusions of law will be upheld on appeal if they are fairly and reasonably supported by findings of fact). The Department's expertise in this area is further evidenced by the fact that, in addition to licensing and disciplining bail bond agents, the Department has developed and continually updated a licensing examination and written study guide that emphasizes, among other things, the relationship between Vermont insurance law and the transactions of a bail bond agent.

■ Much of Palmer's argument challenging the Department's authority to discipline him devolves into scantily supported suggestions that the insurance statutes — particularly those involving unfair trade practices — are unconstitutionally vague when applied to bail bond agents, that the vagueness of the statutes prevented him from getting fair notice of what conduct was circumscribed, and that the Department has improperly created new policy by way of decision in a contested case rather than by rule or regulation. None of these suggestions have a sound legal basis.

As noted, surety agreements, which include commercial bail bonds, are governed by Vermont statutory insurance law, including provisions dealing with unfair trade practices and the licensing and disciplining of agents. Some of the terms of these provisions, including those referring to "incompetent, untrustworthy or financially irresponsible" conduct or practices, see § 4804(a)(9), use general language. But, as we have stated on several occasions, "it is not necessary, or possible, for a statute that regulates a professional field to detail each and every act that is prohibited." *Braun v. Board of*

*Dental Exam'rs,* 167 Vt. 110, 118-19, 702 A.2d 124, 129 (1997) (statute declaring that dentist will be held to degree of care and skill of ordinarily skillful and careful dentist engaged in similar practice under similar conditions is sufficiently clear to inform defendant that conduct he engaged in violated statute). "Statutory language that conveys a definite warning as to proscribed conduct when measured by common understanding and practices will satisfy due process." *Brody v. Barasch,* 155 Vt. 103, 111, 582 A.2d 132, 137 (1990); see *Schweig v. Schacht,* 657 N.E.2d 1152, 1155 (Ill. App. Ct. 1995) (rejecting argument that term "financial irresponsibility" was unconstitutionally vague when applied to defendant's conduct); *Lodes v. State ex rel. Oklahoma Real Estate Comm'n,* 837 P.2d 925, 927 (Okla. Ct. App. 1992) (holding that term "untrustworthy, improper, fraudulent, or dishonest dealings" conveys sufficiently definite warning as to standard of conduct expected of real estate agent).

Here, there was extensive and uncontradicted testimony that the kinds of financial arrangements that Palmer entered into with his clients are not viewed as commercially reasonable within the nationwide bail industry. Several experts, including practicing bail agents, testified that industry-wide standards of commercial reasonableness require the return of collateral not used to indemnify a bail agent for actual losses and out-of-pocket expenses resulting from forfeiture. The president of the National Association of Bail Insurance Companies testified that he was unaware of a single regulatory scheme that would allow bail agents to retain excess proceeds following the liquidation of a client's collateral. Even Palmer's own expert testified that a bail agent has an obligation to notify a client of excess funds and to give the client a reasonable period of time to recoup those funds.

Moreover, the evidence at the hearing established beyond doubt that Palmer knew, or should have known, not only that he had post-release obligations to his client, but that he could be held accountable for financial misconduct occurring both during and after the solicitation and negotiation of a bail agreement. Before sitting for his bail agent licensing examination in 1992, Palmer was provided with a study guide informing him that he would be tested on, among other things, unfair trade practices. Further, the licensing examination that Palmer took contained specific questions concerning a bail agent's fiduciary obligation to return client collateral. Moreover, in 1994, when Palmer sat on a Department-sponsored committee reviewing and updating Vermont's licensing examination, he personally

approved as relevant to the business of bail bonding three proposed examination questions concerning a bail agent's obligation to return collateral upon the termination of his liability under a bond. These findings belie Palmer's contention that he lacked notice that he could be held accountable for financial misconduct concerning his handling of collateral following the solicitation and negotiation of a bail agreement. Because Palmer was on notice that he had an ongoing duty of financial responsibility to his clients and that the conduct he engaged in was inconsistent with industry standards and the producer's contract he signed with Fidelity, Palmer's due process claim must fail.

Next, Palmer contends that the Department's decision impairs contracts in violation of the United States Constitution, Article I, Section 10. Palmer waived this argument by not fairly presenting it below. See *Lanphere v. Beede*, 141 Vt. 126, 129, 446 A.2d 340, 341 (1982) (matters not raised or fairly presented at trial are not preserved for appeal). But even if the argument had been preserved, it has no applicability to the facts of this case. The so-called "Contract Clause" is aimed at limiting the government's reach in interfering with the obligations of *pre-existing* contracts. See *Burlington Fire Fighters' Ass'n v. City of Burlington*, 149 Vt. 293, 297-98, 543 A.2d 686, 689-90 (1988) (although Contract Clause prohibits states from passing laws that impair obligations of contract, it does not absolutely bar states from enacting legislation with retroactive effects; even if plaintiffs establish existence of impairment, "such impairment only violates the clause if it is not reasonable and necessary to achieve an important public purpose"). The Contract Clause does not prohibit states from enforcing statutes that regulate an industry, in part, by prospectively prohibiting unconscionable or financially irresponsible contracts.

Palmer also contends that the record does not support the Commissioner's conclusions that he engaged in financially irresponsible conduct by requiring M.M. and D.A. to enter into commercially unreasonable and unconscionable bail agreements and that he engaged in dishonest and untrustworthy conduct by making deliberately false statements to the district court for his own personal gain. We conclude that the evidence overwhelmingly supports the Commissioner's conclusions and decision. Palmer's conduct with respect to M.M. and D.A., as detailed above, was nothing short of outrageous. The terms of the bail agreements negotiated in those instances were

plainly unconscionable, and defendant's conduct in attempting to enforce the unconscionable terms of those agreements was plainly dishonest. See *Val Preda Leasing, Inc. v. Rodriguez*, 149 Vt. 129, 135, 540 A.2d 648, 652 (1987) (whether contract is unconscionable may turn on substantive fairness of terms or factors relevant to formation of contract, such as unequal bargaining power or lack of opportunity to read contract); see also *Leasing Serv. Corp. v. Broetje*, 545 F. Supp. 362, 366 (S.D.N.Y. 1982) (unconscionable agreement is one marked by absence of meaningful choice on part of one party, together with contract terms that are unreasonably favorable to other party); *Maxwell v. Fidelity Fin. Servs., Inc.*, 907 P.2d 51, 57 (Ariz. 1995) (unconscionability principle involves preventing oppression and unfair surprise).

While it is less clear that Palmer's simple assault conviction demonstrated that he was untrustworthy, the hearing officer did not abuse his discretion in examining that conduct in the context of the other violations. In any event, the assault conviction was not the primary basis for the hearing officer's recommendation or the Commissioner's decision.

■ The record also overwhelmingly supports the Commissioner's conclusions that Palmer (1) engaged in an unfair trade practice under § 4724(12)(A) and improperly withheld his client's funds under § 4804(a)(5) by retaining surplus proceeds from the sale of collateral; (2) engaged in unfair trade practices by charging his clients a premium surcharge without obtaining Department approval, see § 4724(19), and by failing to adequately disclose the terms of the forfeiture provisions in his bail agreements, see § 4724(13) and (15); and (3) violated the laws on premium financing by inserting forfeiture-on-default provisions in his bail agreements that greatly exceeded the delinquency charge allowed under § 7008(a). Finally, given the egregious nature of Palmer's violations, the pattern of misconduct, and Palmer's denial of any wrongdoing in the face of evidence proving otherwise, the record overwhelmingly supports the Commissioner's decision to revoke his license and fine him $10,000.

*Affirmed.*