*State v. Big Bro. Sec. Programs*, No. 326-4-20 Cncv (Toor, J., Apr. 27, 2020).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | CIVIL DIVISION |
| Chittenden Unit | Docket No. 326-4-20 Cncv |

State of Vermont vs. Big Brother Security Programs and Palmer

## ENTRY REGARDING MOTION

.

| | |
|---|---|
| Title: | Motion for Preliminary Injunction (Motion 1) |
| Filer: | State of Vermont |
| Attorney: | Justin E. Kolber |
| Filed Date: | April 13, 2020 |

Opposition  filed April 20, 2020 by Ernest M. Allen, Attorney for Defendants

The State of Vermont brings this case against defendants Big Brother Security Programs Inc. and Shelley Palmer, alleging that they have engaged in unconscionable price-gouging of essential personal protective equipment during the COVID-19 pandemic in violation of the Vermont Consumer Protection Act. The State seeks a preliminary injunction barring defendants from such sales. The court held a preliminary injunction hearing on April 22, a date agreed on by the parties. The parties agreed that the sworn declarations of the State's witnesses—David Cheney, Michael Schirling, and Shea Bellino—would be treated as their direct testimony, and they were all made available for cross-examination by defense counsel. The parties stipulated to the admission of all the exhibits that had previously been submitted by both sides. Both sides chose to present oral argument on the record rather than filing post-hearing memoranda.

### Findings of Fact

The court finds the following facts to be established by a preponderance of the evidence for purposes of this motion. Because this is a preliminary hearing, these facts

are not necessarily binding for future proceedings. The court could reach contrary conclusions with a more through presentation of evidence at trial.

On March 13, Governor Scott declared a state of emergency due to the COVID-19 crisis. Executive Order No. 01-20. That Order noted the March 11 declaration of a COVID-19 pandemic by the World Health Organization, and among other things placed restrictions on travel, visits to residential care facilities and hospitals, and non-essential gatherings. The Order noted:

> it is critical we take steps to control outbreaks of COVID-19, particularly among those who are elderly or already have underlying chronic health conditions, to minimize the risk to the public, maintain the health and safety of Vermonters, and limit the spread of infection in our communities and within our healthcare facilities.

Id. at 1-2.

Defendant Big Brother Security Programs, Inc. is solely owned and managed by Palmer. Its primary business is transporting patients for non-emergency medical treatment. Palmer also has several other businesses, including selling gold bullion, importing renewable energy systems from China, and renting medical equipment such as wheelchairs. Big Brother was not in the business of selling personal protective equipment (PPE) prior to March of this year. Neither Big Brother nor Palmer are certified resellers of PPE.

Palmer has contacts in China and realized that PPE was going to be necessary as the COVID-19 pandemic hit the United States. Through his contacts he obtained thousands of surgical masks. He claims that he paid 55 to 60 cents per mask. He proffered an email that appears to show 60-cent and 65-cent prices (5,000 masks for $3,000 and 5,000 makes for $3,250). Ex. A. However, an invoice in one of the boxes of masks he sold

shows that he paid 10 cents per mask. Ex. 2. Palmer claims that the invoice is a fraudulent document created by someone he does not know for purposes of getting the masks though U.S. customs easily and without a customs duty. The court does not find Palmer's testimony on that issue to be credible, given the fact that—as discussed below—his testimony on other matters was obviously false. The court finds that he paid ten cents per mask.

Palmer went to Central Vermont Medical Center (CVMC) on March 16 and spoke to David Cheney, the Director of Patient Support Services. They apparently knew each other already, presumably from Palmer's medical transport business. Palmer told Cheney he had surgical masks available for sale. Cheney asked for samples and pricing. On March 17, Palmer returned with a sample pack of 50 masks and quoted a price of $2.50 per mask. He said they were "considered in China as N95 masks." Cheney could see they were clearly only surgical masks.

Palmer told Cheney he was "here to help" and was not making a profit on the masks. That was clearly false. Cheney told Palmer the hospital usually paid 6 cents per mask, but that the hospital "had little choice due to the impending PPE shortages and need to keep patients and employees safe." Cheney Declaration at 9. Cheney had the samples reviewed by the hospital's quality control department, which found that they met standards for surgical masks. He then received approval to purchase them, and bought 9,500 on March 18, 15,000 on March 20, and 18,000 on March 24, all for $2.50 per mask. CVMC paid 6 cents per mask prior to the COVID-19 crisis. During the crisis, it has paid other sellers up to 30 or 40 cents per mask. CVMC paid the much higher prices for Palmer's masks because of concerns about the supply shortage and the need to protect

3

employees and visitors. CVMC currently has a large shipment of PPE on order that it is having trouble getting into the United States.

The invoices to CVMC from Big Brother falsely described them as N95 masks. The original packaging in which the masks came did not say N95, but only "face masks." Exs. 4c, 4d. In one of the boxes was an invoice from the manufacturer showing a sale price of 10 cents per mask. Ex. 2.

Mr. Palmer tried to sell the masks to Champlain Medical Urgent Care on March 17. The conversation was recorded on the office video system. Palmer held two packets of masks wrapped in plastic and offered them to the practice for $2.50 a mask. He said: "these aren't the fancy ones, these are regular industrial N95s." The medical assistant, Shea Bellino, looked at the package and said: "these look like surgical masks to me, not the N95s." A coworker held up an N95 mask and showed Palmer what N95s look like. Palmer responded: "those each have the same rate" and asserted that his were N95s because they had "the aluminum that goes on your nose."

Bellino's declaration adds to what can be heard on the video. She explained that aluminum on the mask does not make it an N95 mask. Bellino is familiar with such masks because the clinic specializes in occupational health services and many of the clinic's patients are sent by their employers to be fitted for respirators. She routinely conducts N95 fit testing and was clear that Palmer's masks were not N95s. The practice declined to purchase them. Bellino Dec. ¶¶ 9-12.

The same day, Palmer approached the Vermont Department of Public Safety with an offer to sell it masks. He met with Commissioner Michael Schirling, and showed him a box of masks that Palmer stated were N95 masks. Palmer offered to sell 10,000 masks for $2.50 each. Schirling and Deputy Commissioner Christopher Herrick examined the

masks and, being familiar with N95 masks, immediately saw that they were merely surgical masks. They told Palmer the price was too high for surgical masks, which should be under $1.00, and declined to purchase them. Palmer continued to maintain that they were N95 masks. Palmer asserts that Commissioner Schirling is lying both about Palmer claiming they were N95 masks, and about Schirling saying the price was too high for surgical masks. The court disagrees, and finds Commissioner Schirling credible.

Palmer testified that he is OSHA certified and knows all about the different types of masks. He also asserts that an N95 "is a respirator, it is not a mask." He claims that his office manager put "N95" on the CVMC invoices without his input, and that he does not care what she puts on the invoices. The court does not find it credible that the office manager would do that without Palmer's direction, given that the masks were not identified as N-95 by the distributor.

At the end of March, the State sent Palmer a cease-and-desist order.[1] However, Palmer contacted CVMC again on April 6 and said that "the AG had reached out" so he was no longer selling the masks, but had a "partner company" that could sell them. He identified that company as "RICHCO Inc." and stated that the price remained $2.50. CVMC bought 16,850 more masks for $2.50 each on April 6 and 8 by payment totaling $41,625 to RICHCO. They were delivered by someone wearing a Big Brother Securities t-shirt.

Palmer's testimony as to his actions after receiving the cease-and-desist letter was inconsistent. He first denied selling masks to anyone other than CVMC. Later he claimed that he had sold some to one of his own employees, Richard Morrell. Morell's wife is

---

[1] The letter was not offered in evidence, and it is unclear whether Palmer was ordered to stop selling masks entirely, or ordered to sell only at lower prices.

Palmer's office manager. Palmer claimed that he did not tell Morrell to sell them to CVMC, or that the price should be $2.50. He claimed that Morrell must have made those decisions himself, since he knew where Palmer had been selling them and for how much. Palmer also claimed that he believed Morrell was selling the masks out of state.

The court finds these claims are false. Palmer either had Morrell sell CVMC 16,850 masks for Palmer through a front company, or sold the masks to Morrell at roughly $2.00 a mask to resell, after the State sent the cease and desist letter. Morrell personally paid Palmer a total of $32,500 in two separate payments on April 2, and one on April 10. Palmer had the payments go to a different one of his companies, Ca-Ching, Inc., rather than to Big Brother. Ca-Ching then paid the funds over to Big Brother.

Palmer asserts that the price of $2.50 a mask was justified because in addition to the price he paid for the masks—which he claims was 50-60 cents per mask, but which the court has found was 10 cents per mask—he incurred costs for loans to buy them, staff to repackage them, a 4 % credit card fee that the seller charged back to him, and bank transfer fees. He offered no documentation of any of these alleged costs. He claims that he had his staff repackage the masks in 50-count quantities into Ziplock bags (while wearing PPE and in a decontamination room) after the first shipment to CVMC because it was reported to be undercounted. However, all of the photos of the deliveries to CVMC show the masks in their original packaging. Ex. 4. The court does not find Palmer's claims about all of these extra costs to be credible. The court finds that his cost was actually ten cents per mask, with no other costs but his minor expenditure of time delivering them, which he has not documented. Therefore, he was charging essentially 2500 % of his cost.[2]

---

[2] In any case, even if his claims were true, Palmer testified that the additional expenses increased his cost to a total of only $1.00 per mask. Under his own numbers, then, his profit would have been 150 % of his cost.

His profit was $2.40 per mask, or a 2400 % profit. Palmer asserts that this was nonetheless a very reasonable price because the masks are in short supply all over the United States and "no one can get any." He claims that "people are very appreciative to get a quality product at a price they can afford."

Palmer states that he has given away thousands of the masks for free, including to his wife's department at UVM Medical Center, police departments, and grocery stores. That is not directly relevant to whether his sales and attempted sales were in violation of the law.

In sum, the court rejects much of Palmer's testimony, because some was just not believable, some was contradicted by other more credible witnesses, he changed his own testimony from moment to moment, he lied to his customers, and he blatantly lied under oath. For example, Palmer falsely testified that he never said the masks were N95 masks despite the fact that he is heard on video saying exactly that, and Commissioner Schirling also credibly testified that he said that. Palmer testified that he repackaged most of the masks into zip-lock bags despite the photographs in evidence clearly showing they were sold in their original plastic packaging from China. He lied to his potential customers when he said that he was just there "to help" and when he claimed he was not making a profit. He falsely testified that he never told CVMC he could sell more masks through another company despite the cease-and-desist letter. His claims are for the most part entirely lacking in credibility.

Conclusions of Law

To obtain a preliminary injunction at the start of a case a plaintiff must normally demonstrate "(1) the threat of irreparable harm to the movant; (2) the potential harm to the other parties; (3) the likelihood of success on the merits; and (4) the public interest."

Taylor v. Town of Cabot, 2017 VT 92, ¶ 19, 205 Vt. 586; Glossip v. Gross, 135 S. Ct. 2726, 2736 (2015). Irreparable harm generally means that the harm cannot be fully remedied at the end of the litigation—for example, by an award of money damages. Taylor, 2017 VT 92, ¶¶ 40-42; In re Investigation Into Gen. Order No. 45, 2013 VT 24, ¶ 7, 193 Vt. 676 (mem.). "Because of the often drastic effects of the temporary injunction, the power to issue it must be used sparingly, and only upon a showing of irreparable damage during the pendency of the action . . . ." State v. Glens Falls Ins. Co., 134 Vt. 443, 450 (1976).

However, where the government seeks an injunction to enforce a statute, it generally "is not required to show irreparable harm or the unavailability of an adequate remedy at law. . ." Town of Sherburne v. Carpenter, 155 Vt. 126, 129 (1990). Under those circumstances, we "instead employ a presumption of irreparable harm based on a statutory violation." City of New York v. Golden Feather Smoke Shop, Inc., 597 F.3d 115, 120 (2d Cir. 2010). "The passage of the statute is, in a sense, an implied finding that violations will harm the public and ought, if necessary, be restrained." United States v. Diapulse Corp. of Am., 457 F.2d 25, 28 (2d Cir. 1972). Thus, the State need not demonstrate irreparable harm here: it is presumed if the State shows a likelihood of success on the merits.

Likelihood of Success

The State relies upon the Vermont Consumer Protection Act (the Act), 9 V.S.A. § 2451 et seq. That statute provides that the Vermont Attorney General may seek a preliminary injunction to restrain violations of the Act. Id. § 2458(a). The specific provision at issue here is Section 2453(a), which provides as follows: "Unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are hereby declared unlawful." Although the phrase "unfair or deceptive acts or practices in

8

commerce" is not defined, the Act points the courts to the interpretations given to the phrase under federal law. Id. § 2453(b); Poulin v. Ford Motor Co., 147 Vt. 120, 124 (1986). Although the Act refers to "consumer" protection, it applies to business customers as well as individual customers. Id. at § 2451a(a); Rathe Salvage, Inc. v. R. Brown &Sons, Inc., 2008 VT 99, ¶ 21, 184 Vt. 355. The Act "is designed not merely to compensate consumers for actual monetary losses resulting from fraudulent or deceptive practices in the marketplace, but more broadly to protect citizens from unfair or deceptive acts in commerce . . . and to encourage a commercial environment highlighted by integrity and fairness." Anderson v. Johnson, 2011 VT 17, ¶ 7, 189 Vt. 603 (quotations and citations omitted).

The State argues that selling the surgical masks at issue here at 2500 % of cost—or even 150% of cost as Palmer claims—is an unfair act in commerce. The Vermont Supreme Court has pointed to three criteria to consider in determining whether a practice is unfair, including (1) whether it "offends public policy," (2) whether it is "immoral, unethical, oppressive, or unscrupulous," and (3) whether it "causes substantial injury to consumers." Christie v. Dalmig, Inc., 136 Vt. 597, 601 (1979), quoting F.T.C. v. Sperry & Hutchinson Co., 405 U.S. 233, 244 n.5 (1972).

Our Supreme Court has not yet addressed whether all three criteria are required. However, the United States Supreme Court in Sperry seemed to reject that argument (albeit in passing in a footnote). Sperry, 405 U.S. at 244 n.5. The Federal Trade Commission has since made that its express position. FTC Policy Statement on Unfairness (Dec. 1980), 2 Fed. Trade Comm'n. Appendix D-1 (noting that "[u]njustified consumer injury" by itself "can be sufficient to warrant a finding of unfairness" and "[s]ometimes public policy will independently support a Commission action."); *see also*, Ramirez v.

9

Health Net of the Northeast, Inc., 938 A.2d 576, 589 (Conn. 2008)("All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.")(citation omitted); Johnson v. Phoenix Mut. Life Ins. Co., 266 S.E.2d 610, 621 (N. C. 1980)("A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, *or* substantially injurious to consumers.")(emphasis added; citations omitted). Palmer does not argue to the contrary (arguing instead only that "the three criteria . . . have little application to the facts" here—Opp. at 3). Thus, the court concludes that the three factors are independent.

Public Policy

The first issue is that of public policy. To determine this question, we look to whether the policy is "established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness." 29 Fed. Reg. 8355 (1964), *quoted in* Sperry, 405 U.S. at 244 n. 5. The only Vermont Supreme Court case the court has found addressing whether overpricing is an unfair practice is Lalande Air & Water Corp. v. Pratt, 173 Vt. 602 (2002)(mem.). That case involved a mobile home rent increase. The court held on the facts of that case that the increase, and the landlord's attempts to collect it, were not unfair practices. It did not reject the overall idea that such increases could, at some level, constitute an unfair practice.

Here, the State points to a number of sources for a policy determination. The first is the COVID-19 emergency declaration issued by Governor Scott on March 13—several days before the acts at issue here—which focused on the need to protect public health in

the community and "within our healthcare facilities." Executive Order No. 01-20 at 2. The next is other states' "price-gouging" laws, as well as Vermont's fuel products price-gouging law, 9 V.S.A. § 2461(d). The last is federal law, which bars price-gouging of designated critical materials, including PPEs such as face masks. 50 U.S.C. §4512; Notice of Designation of Scarce Materials or Threatened Materials Subject to COVID-19 Hoarding Prevention Measures (effective March 25, 2020)("HHS Notice").

Price-gouging is a term of art used to mean "[t]he unlawful or unfair raising of prices." Black's Law Dictionary (11th ed. 2019). For example, New York's price-gouging law bars "charging unconscionably excessive prices for essential consumer goods during disruptions in the market caused by such forces as strikes, power failures, weather conditions and other emergencies." People by Abrams v. Two Wheel Corp., 525 N.E.2d 692, 693 (N. Y. 1988). The Vermont statute to which the State points says, inter alia, that a price for a fuel product "is unconscionably high" if there is "a gross disparity" between it and the pre-emergency prices,[3] and that disparity is not substantially attributable to increased costs at the supply end. 9 V.S.A. § 2461d(c). Other states use similar definitions for "unconscionably excessive" or "unconscionably high" prices during states of emergency. *See, e.g.*, N.Y. Gen. Bus. Law § 396-r (McKinney); Fla. Stat. Ann. § 501.160 (West). The federal law bars sales "in excess of prevailing market prices." 50 U.S.C.A. § 4512.

Under any of these statutes, the $2.50 per mask prices Palmer charged—at a $2.40 profit per mask—would be excessive. They were certainly "in excess of prevailing market

---

[3] That fuel products statute refers to the pre-emergency prices at which the *defendant* sold the product. 9 V.S.A. § 2461d(c)(1)A). Here, defendants were not selling the product prior to the emergency. However, the concept is the same for purposes of the analogy the State is making: what was the product going for prior to the emergency?

prices" and there was unquestionably a "gross disparity" between his price and both pre-emergency and current prices in the marketplace—respectively 6 cents per mask and 30-40 cents per mask. The question is whether these analogous provisions are a proper source for a finding that Palmer's conduct violated public policy. Palmer argues that they are not, for two reasons. First, because the Legislature has never passed a price-gouging law for PPE, only—in 2005—for fuel products. Second, because the Governor's emergency declaration does not squarely address "hospital supplies of the pricing thereof." Opp. at 4.

The fact that there is not a precise statute or declaration directly discussing PPEs is not relevant. If a separate law or executive order was required to find a particular practice unfair under the Act, the Act would have little meaning. Moreover, the Sperry case expressly rejected the argument, concluding that in determining what is "unfair" the FTC may "consider[] public values beyond simply those enshrined in the letter or encompassed in the spirit of" other laws. Sperry, 405 U.S. at 244.

Palmer also argues that there is nothing wrong with making a large profit, and that many businesses routinely have significant markups on their products. However, no evidence was presented to support such claims, and even Palmer did not argue that charging 2500 % of cost is a normal business practice in any industry. Even if it were, the issue here is what is fair when the product is a crucial one needed by medical providers and patients during a health emergency, not what is permissible in normal market conditions.

The court concludes that charging extremely inflated prices to medical providers for crucial personal protective equipment during a public health emergency is a violation of public policy. Palmer's pricing of 25 times his cost, and at least six times the prevailing

price during the emergency, is by any measure grossly excessive and unconscionably high. Even if the court accepted his claims that his cost was $1.00 per mask rather than 10 cents—which it does not—he was making a profit of 150%. That, too, would be grossly excessive and unconscionably high. Such overcharging for needed medical supplies during a pandemic the likes of which few people alive today have ever seen, solely for personal profit, shocks the conscience. There is no question that it meets the definition of unfair business conduct.

Palmer presents several other skeletal arguments in opposition. First, he argues that there is no proof that CVMC is a "consumer" under the Act, because those who purchase for resale are not consumers. 9 V.S.A. § 2451(a). Palmer argues that perhaps CVMC resells masks to patients. The court deems that highly unlikely, but in any case Palmer's speculation is not a sufficient basis on which the court can rule. As Palmer presented no evidence to support these musings, the argument fails.

Next, Palmer argues that the Act applies only to acts removing competition from the marketplace. He cites zero authority for that proposition, and the court rejects it. The Act "is designed not merely to compensate consumers for actual monetary losses resulting from fraudulent or deceptive practices in the marketplace, but more broadly to protect citizens from unfair or deceptive acts in commerce . . . and to encourage a commercial environment highlighted by integrity and fairness." Anderson, 2011 VT 17, ¶ 7 (quotations and citations omitted).

Palmer also contends that there was no deception here because the prospective purchasers were all smart enough to know the masks were not N95s, and the one purchaser knew what it was getting: surgical masks, not N95 masks. As the State is not relying on the "deceptive act" portion of the statute, this is not relevant.

13

Finally, Palmer argues that the statute is too vague to be enforced. Again, he cites zero authority for this proposition. Palmer unsuccessfully made a similar argument in a previous case. In re Palmer, 171 Vt. 464 (2000). The case involved the revocation of Palmer's license to act as a bail bondman due to a "pattern of misconduct." Id. at 469. In addition to lying to a court—as here—the misconduct included (1) taking a deed to a defendant's home worth $28,500 as collateral for $200 bail, then transferring title to himself when the defendant failed to pay him the $200, and (2) taking a truck as collateral for a $2,500 promissory note for bail, then selling the truck and keeping the full $17, 650 sale price for himself. The statute in question, which applied to insurance and similar businesses, used the same language as in the Act here: "unfair or deceptive act or practice." 8 V.S.A. §  § 4723. It also barred "untrustworthy or financially irresponsible" conduct. Id. § 4804(a)(9). Among other things, Palmer argued that "the vagueness of the statutes prevented him from getting fair notice of what conduct was circumscribed." Id. at 471. The Court rejected that claim, ruling that "[s]tatutory language that conveys a definite warning as to proscribed conduct when measured by common understanding and practices will satisfy due process." Id. at 472. The Court went on to note that "Palmer's conduct . . . was nothing short of outrageous. The terms of the bail agreements negotiated in those instances were plainly unconscionable, and defendant's conduct in attempting to enforce the unconscionable terms of those agreements was plainly dishonest." Id. at 473-74. The same is true here. Palmer's claim that similar statutory language here is too vague for him to have known what was proscribed falls flat.

Because the court has found that Palmer's actions violate public policy, it need not address the other two potential bases for a finding of unfairness under the Consumer

14

Protection Act. The court concludes that the State is likely to succeed on the merits of its claim at trial.

## Potential Harm to Others

Before issuing a preliminary injunction, the court must also weigh the potential harm to others. Palmer and his company proffered little evidence in the way of harm to them. Palmer testified that he has many businesses, and that selling PPE is a new venture he has just stepped into, so there is no evidence that he will be put out of business in general.[4]  Other than the fact that he took out a loan to purchase some of the materials, which the court questions as it is entirely undocumented, no evidence was presented as to any real harm to him or his company.

There is potential harm to others in that the surgical masks Palmer was selling may not be otherwise available to Vermont purchasers. However, Palmer could  certainly choose to sell them for a reasonable price instead. The evidence did not establish that he is the only source of such masks in Vermont, or how much his contribution of masks to the market here matters. No medical providers testified that they desperately need his masks today. The court does not have sufficient evidence to find that there will be significant harm to consumers if Palmer is enjoined from selling masks at inflated prices.

## The Public Interest

The last element of the preliminary injunction analysis is the public interest. In this case, as noted above, there is a presumption that it is in the public interest to enforce laws passed by the Legislature for the protection of the pubic. "The passage of the statute is, in a sense, an implied finding that violations will harm the public and ought, if

---

[4] At the end of the hearing , after the evidence was closed and legal arguments were concluded, Mr. Palmer spontaneously offered that he has lost other business due to the allegations by the State. As he was not under oath and the evidence was closed, the court cannot consider such an offhand  statement.

necessary, be restrained." <u>Diapulse</u>, 457 F.2d at 28. Palmer offers no contrary argument. There is of course a public interest in making PPE available to medical providers and patients, but that is not the question. The court is not being asked to bar Palmer from selling PPE at all: only to bar him from selling such equipment at outrageously inflated prices. The court can see no public interest that supports his pricing.

<u>Order</u>

The evidence established that Palmer and his company bought surgical masks from China for 10 cents a mask, and then marketed and sold them to medical professionals at a price of $2.50 a mask. This was a $2.40 profit per mask. Selling crucial personal protective equipment (PPE) desperately needed to save lives during a health emergency at a 2400 % markup is an unconscionable act in violation of public policy. The State is therefore likely to succeed at trial on the merits of its claim that Palmer and Big Brother Security, Inc. violated the Vermont Consumer Protection Act. There was no evidence of any significant harm to others if the injunction is issued, and the public interest supports enforcement of the consumer protection laws. Therefore, the State is entitled to a preliminary injunction barring Palmer and any of his companies from selling PPE at inflated prices. Palmer may file by April 30 any objection to the specific language in paragraphs 7-13 of the preliminary injunction order proposed by the State.

Electronically signed on April 26, 2020 at 02:09 PM pursuant to V.R.E.F. 7(d).

_____
Helen M. Toor
Superior Court Judge

Notifications:

Justin E. Kolber (ERN 4303), Attorney for Plaintiff State of Vermont

Ernest M. Allen (ERN 3968), Attorney for Defendant Big Brother Security Programs

Ernest M. Allen (ERN 3968), Attorney for Defendant Shelley Palmer

Merideth C. Chaudoir (ERN 5805), Attorney for party 1 Co-Counsel

James David Renner (ERN 6803), Attorney for party 1 Co-Counsel